## Commonwealth *v.* Butler, Appellant.

38

Argued March 20, 1961. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

reargument refused August 31, 1961.

*Marjorie Hanson Matson,* with her *H. David Rothman,* for appellant.

*Samuel Strauss,* Assistant District Attorney, with him *William Claney Smith,* Assistant District Attorney, and *Edward C. Boyle,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, July 18, 1961:

The defendant, John F. Butler, was indicted for murder. A jury trial under the "Split-Verdict Act" of December 1, 1959, P. L. 1621, §1, 18 PS (supp.) §4701, resulted in a verdict of guilty of murder in the first degree with the punishment fixed at death. A new trial was denied. From the judgment of conviction and sentence, this appeal is prosecuted.

The facts, as disclosed by the testimony, may be briefly summarized as follows: The defendant was sentenced to the Eastern State Penitentiary for a period of from four to ten years following his conviction in Northumberland County for armed robbery, involving five Catholic priests residing in a monastery in Mount

Carmel, Pennsylvania. In April 1959, he was confined under this sentence in the State Correctional Institution in Pittsburgh. He presented a petition for a writ of habeas corpus in the courts of Northumberland County alleging irregularities in his conviction and sentence. A hearing on this petition being ordered, the defendant was returned to that county to permit his attendance. The petition was then withdrawn upon the advice of counsel, who concluded the factual assertions therein were not true. On the following day, while being returned to the institution in Pittsburgh by James R. Lauer, the Sheriff of Northumberland County, in an automobile operated by an aide, one Martin Diehl, Butler shot and killed the sheriff. He escaped and was apprehended the following day.

Immediately before the shooting, the defendant was in the back seat of the automobile, restrained by handcuffs, which were fastened to a leather belt. Sufficient looseness was allowed to permit him to raise his hands for the purpose of smoking. Sheriff Lauer was sitting in the front seat with the driver; the sheriff's gun lying under a paper on the seat between them.

After leaving the Pennsylvania Turnpike at the Perry interchange, the party inadvertently made a wrong turn. It was raining very hard and visibility was poor. After inquiry, they turned around and were headed back in the direction of the institution, when suddenly the defendant "lurched" over the front seat and grabbed the gun. The sheriff, jumped into the back seat and tried to seize the defendant, yelling, "John, don't do it." The defendant said, "Let me go Jim or I'll kill you." The driver, Diehl, hurriedly pulled the car over to the side of the road, jumped out and opened the rear door. The sheriff was then lying on his side on the floor between the seats, with his head raised in the corner on the driver's side of the car. The defendant was on the back seat, crouched in the op-

posite corner of the car. At that moment, the gun was fired.[1] The defendant said to Diehl, "I'll get you." The latter ran down the road for assistance and the defendant disappeared into the woods.

Several trial errors are urged in support of the contention for a new trial. We shall discuss them ad seriatim.

The testimony of the Commonwealth as to the incidents surrounding the fatal shooting was uncontradicted. The defendant did not take the stand or offer testimony in denial during that portion of the trial wherein his guilt or innocence was decided,[2] and at no time did he deny firing the fatal shot. The sole defense was insanity and the testimony offered in support of this was that of a psychiatrist, Dr. Jacobs, who first examined the defendant one year after the offense was committed. This witness also studied and considered the results of tests given by a psychologist; the reports and evaluations of both the Behavior Clinic of Allegheny County and the Diagnostic Clinic of the penitentiary; and, the defendant's case history. He opinionated that the defendant manifested "a personality pattern disturbance, schizoid personality, with sociopathic features." He further expressed the belief that, at the exact moment the shooting occurred, the defendant was in a temporary state of confusion and panic and unable to understand the value and conse-

---

[1] The bullet entered the left quadrant of Lauer's body 41½ inches above the under surface of the heel and 6¼ inches to the left of the midline, and exited 42½ inches above the under surface of the heel and 4½ inches to the right of the midline of the back. There were two bullet holes in the front of the shirt but one entry wound thus indicating a fold in the shirt. There was no evidence of a contact wound nor any evidence of powder burn on the clothing.

[2] He did testify in the supplemental proceeding wherein the punishment was determined.

quence of his acts or to distinguish right from wrong. He also stated that, in his opinion, the defendant was legally sane at all times when he examined him, and legally sane at all times except for a short period of time during which the shooting occurred.

In rebuttal, the Commonwealth called as its witness a psychiatrist employed at the Mayview State Hospital. He testified that, during his examination of the defendant, he found no evidence of psychosis or neurosis of any type, nor any indication of mental irresponsibility. The Commonwealth also called as witnesses Dr. Davis, a psychiatrist, and Dr. Grove, a psychologist, both employed by the Allegheny County Behavior Clinic. The admission of this latter testimony is vigorously urged to be prejudicial error.

Three principal objections have been raised to the testimony of Dr. Davis and Dr. Grove: (1) That since they were employees of the Behavior Clinic, an arm of the court, permitting them to testify was a departure from traditional methods of procedure protected by the Pennsylvania Constitutional requirement that "trial by jury shall be as heretofore." (2) That permitting this testimony violated the defendant's constitutional rights against compulsory self-incrimination. (3) That permitting this testimony violated the requirements of fundamental fairness inherent in the requirements of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.

The Behavior Clinic of Allegheny County was established in the year 1938, by order of the court. It is staffed with specially trained professional personnel, who examine individuals arrested and charged with crimes of a certain nature (including murder) and prepare psychological and psychiatric evaluations. This information is primarily for use by the court in the disposition of cases. When the defendant, Butler, was first arrested, upon the advice of counsel, he repeatedly

refused such an examination. Dr. Davis discussed with his counsel the advisability of conducting an examination of the defendant and her wishes in regard thereto. She stated she desired the matter deferred. Later on, counsel informed Dr. Davis that the examination met with her approval, and it was subsequent to this (January 5, 1960) that the examination began.[3] The defendant admitted in his testimony at the hearing on the penalty that, on advice of counsel, he submitted to the examination voluntarily and willingly.

Following the examinations of the defendant by Dr. Davis and Dr. Grove, the district attorney, upon petition, secured an order from the court permitting the use at trial of the testimony of the clinic's personnel by either side. Notice of this action was given to the defendant's counsel before the trial began. In addition, the nature of Dr. Davis' testimony was well known to both sides, having been disclosed in a preliminary proceeding, wherein counsel for the defendant sought court to appoint a psychiatrist and psychologist at county expense.[4]

Dr. Grove testified that he found no indication of psychosis. Dr. Davis testified that, in his opinion, the defendant was legally sane at the time of the shooting, could differentiate between right and wrong and knew what he was doing. These conclusions were made upon the basis of personal interviews with, and observations of, the defendant. The results of a Stanford-Binet perception test and the Wechsler-Bellevue Intelligence Test, plus a diagnostic and summary report received from the Eastern State Penitentiary, as well as a statement given by the defendant to the authorities follow-

---

[3] Approximately six months after defendant's arrest for murder.

[4] While the court denied this latter request, it did subsequently grant permission for examination of the defendant by experts chosen by each side.

ing his arrest, were also studied and considered before these conclusions were reached.

The testimony of these witnesses was properly admitted. No constitutional rights of the accused were violated. The examinations ensued only after the defendant and his counsel expressed a willingness that they proceed. Any information gained therefrom was with their consent and approval.[5] It is stretching the truth to now say that this, in effect, was compelling the defendant to disclose self-incriminating facts. The privilege against self-incrimination does not prohibit the introduction of evidence given by a defendant voluntarily: *Commonwealth v. Bryant,* 367 Pa. 135, 79 A. 2d 193 (1951), cert. den. 341 U. S. 954, 71 S. Ct. 1007. In addition, the personal characteristics and behavior of the defendant were open and observable to these doctors during his incarceration. This is not information of a written or spoken nature which the constitutional privilege against self-incrimination is designed to protect. See 32 A.L.R. (2d) 430; *State v. Myers,* 220 S.C. 309, 67 S.E. 2d 506 (1951) ; *Hunt v. State,* 248 Ala. 217, 27 So. 2d 186 (1946) ; *Ingles v. People,* 92 Colo. 518, 22 P. 2d 1109 (1933) ; *Commonwealth v. DiStasio,* 294 Mass. 273, 1 N.E. 2d 189 (1936) ; *Noelke v. State,* 214 Ind. 427, 15 N.E. 2d 950 (1938). In *Commonwealth v. Musto,* 348 Pa. 300, 35 A. 2d 307 (1944), this Court held that the constitutional immunity from self-incrimination does not apply even to a compulsory examination to determine the defendant's physical or mental condition for the purpose of enabling the examiner to testify in regard thereto, provided the defendant is not *compelled* to answer any questions propounded to him

---

[5] While in counsel's brief, it is stated that the defendant consented to these examinations only after he received direct assurances that the information gained would be used only after conviction for the information of the judge, there is nothing in the record to support or justify this statement.

by the examiner. See also, *Commonwealth v. Kravitz,* 400 Pa. 198, 161 A. 2d 861 (1960). This defendant disclosed nothing under compulsion as the record renders abundantly clear. While in view of the present facts this further comment is unnecessary, we point out that the Supreme Court of the United States has directly ruled that some of the privileges guaranteed the individual citizen by the Bill of Rights, specifically, the Fifth Amendment's protection against self-incrimination does not apply in state trials: *Adamson v. Calif.,* 332 U. S. 46; *Twining v. New Jersey,* 211 U. S. 78; *Palko v. Connecticut,* 302 U. S. 319.

Nor did the introduction of this medical testimony in any way violate the provisions of the Pennsylvania Constitution in regard to jury trial safeguards, or amount to "fundamental unfairness" resulting in lack of due process. The law has one objective and that is the ascertainment of the truth. The fact that Dr. Davis and Dr. Grove were employees of a clinic, established to aid the court in the ascertainment of true and helpful facts, did not affect the relevance or value of their testimony. It was not a denial of due process. The evidence was made available before trial to both the defendant and the Commonwealth. The jury was completely conversant with its background. The modern tendency to utilize the services and testimony of specially trained professional people designated by the court itself, particularly in criminal trials where insanity is pleaded, is generally recognized as a progressive step which brightens the light of truth and reduces immeasurably the darkness of uncertainty. See, 2 Wigmore, Evidence, §563 (3d ed. 1940) ; also 20 F.R.D. 317-352.

This identical question was considered in the case of *Jessner v. State,* 202 Wis. 184, 231 N.W. 634 (1930), wherein at 637, we find this pertinent reaction: "It is next contended that the statute violates sec. 7, art.

I, of the Wisconsin Constitution, guaranteeing a jury trial. This contention is based upon the provision of the law that the fact that such witnesses have been appointed by the Court shall be made known to the jury, thus making the Court stand sponsor for the credibility and reliability of such experts, which it is claimed is a perversion of that right of trial by jury preserved by the Constitution. . . . It is said that the fact that the experts are appointed by the Court, which fact is made known to the jury, necessarily leads the jury to give a sanctity and a weight to their testimony which is not accorded to other witnesses. . . . If any limitations are imposed by this constitutional provision upon the character of the trial to which the accused is entitled other than those specifically mentioned, such limitations cannot be greater than those existing at the common law. The only limitations which the common law imposed upon the Trial Judge in the matter of expressing his opinion with reference to the merits of the case was that he should make it clear to the jury that they were not bound by his opinion, and that their decision upon the facts was exclusively for them." See also, *People v. Strong,* 114 Cal. App. 522, 300 P. 84 (1931) ; *People v. Cornell,* 203 Cal. 144, 263 P. 216 (1928).

It is next advanced that the trial judge erred in ruling that if the defendant took the stand and testified on his. own behalf, the Commonwealth would then be permitted to show his previous criminal record for the purpose of attacking his credibility. It is stated that this is the only reason why he did not testify during the main part of the trial. In the first place, no such adverse ruling was ever made; nor was such required since this point was never reached in the trial. Assuming, however, that counsel did seek an off-the-record declaratory ruling on this question, and the court indicated an intention to so rule, no error exists. It has been the law in Pennsylvania for decades that whenever

a *witness or a defendant* takes the witness stand, his testimony may be impeached by showing prior convictions of felonies or misdemeanors in the nature of crimen falsi: See: *Commonwealth v. Dorst,* 285 Pa. 232, 132 Atl. 168 (1926); *Commonwealth v. Quaranta,* 295 Pa. 264, 145 Atl. 89 (1928); *Commonwealth v. Yeager,* 329 Pa. 81, 196 Atl. 827 (1938); *Commonwealth v. Harvie,* 345 Pa. 516, 28 A. 2d 926 (1942); *Commonwealth v. Kostan,* 349 Pa. 560, 37 A. 2d 606 (1944). It is, and has long been, the rule in the Federal courts as well. See *United States v. Katz,* 173 F. 2d 116; *United States v. Haynes,* 173 F. 2d 223.

This rule of evidence is founded on common sense and logic. If a defendant offers himself as a person worthy of belief, the jury has the right to know what kind of man he is—to aid in assessing his credibility. His previous record is admissible for this purpose just the same as testimony of prior reputation for veracity is evidence for the jury's consideration. The "Split-Verdict Act" of 1959, supra, did not intend to, nor did it, change this long established rule. The sin and unfairness which this legislation aimed to obliviate was that which crept into the law after the passage of the Act of May 14, 1925, P. L. 759, §1, placing with the jury the responsibility of fixing guilt and punishment in one verdict. It concerned itself only with the procedure to be followed in determining the punishment for those convicted of first degree murder. It did not deal with the rules of evidence incident to the impeachment of witnesses. The title to the act renders this crystally clear. It is as follows: "Amending the act of June 24, 1939 (P. L. 872) entitled 'An act to consolidate, amend and revise the penal laws of the Commonwealth', *changing the method for determining the penalty to be imposed for the crime of murder in the first degree.*" (Emphasis added.)

There are other compelling reasons why no prejudicial error was committed herein in this regard. The previous serious criminal record of the defendant was placed affirmatively before the jury by the defendant's own witness, Dr. Jacobs. The past activities of the defendant were considered of prime importance by the doctor in assisting him in arriving at his conclusions. This history of the defendant was relevant in determining mental capacity. See *Commonwealth v. Williams*, 307 Pa. 134, 160 Atl. 602 (1932). May we add too, that if the defendant were insane and that was the only defense offered, evidence of his prior record would probably benefit, rather than harm him. A final word before we leave this particular assignment of error—as pointed out before, the statement is made that the court's attitude in respect to the admission of this evidence influenced the thinking and conclusion to keep the defendant off the stand. A close examination of the record raises great doubt as to the correctness of this allegation. The defendant did take the stand in the supplemental proceeding, wherein the punishment was fixed. He then told his story as to how the shooting occurred. He said that he didn't intend to kill Sheriff Lauer; that he didn't know whether he pulled the trigger; and attempted to depict a set of circumstances which could lead to the conclusion that the gun was accidently fired in his attempt to escape. He said he grabbed the gun, in the first place, in order to save himself from being shot while running away. But, all of this was given to the jury by Dr. Jacobs, in reciting the defendant's version of the shooting as given to him. In short, the defendant's version of the occurrence was cleverly placed before the jury without calling him as a witness, in an indirect manner through the direct testimony of defendant's psychiatrist. This device also saved the defendant from the ordeal and possible consequences of cross-examination during the main portion of the trial.

It is argued that the defendant was deprived of due process of law by the manner of use of a statement, reduced to writing, that he gave to the authorities immediately following his arrest. During the main portion of the trial, this exhibit was identified, but not offered in evidence. Defense counsel, at this point, requested the opportunity to examine it. The court denied the request but, specifically, ruled that when, and if, it were offered in evidence, counsel would then have the right to examine it. This was a correct ruling.

The statement was not offered in evidence or used until the defendant testified personally in the supplemental proceeding. The reason for this is manifest. The defendant on cross-examination was asked to identify it and was then asked questions concerning specific answers he had given at the time of his arrest as disclosed therein. It was then offered in evidence and admitted. No request, at any time during this part of the case, was made by defense counsel to examine the exhibit. Such was her right as the ruling of the court, above referred to, rendered perfectly clear. Her failure to make such a request may not now be laid at the door of the trial court.

It is averred that a portion of the defendant's statement specifically referred to the account of the killing as narrated by Commonwealth's witness, Diehl, immediately after the occurrence, and that it was at variance with the testimony given by Diehl on the witness stand. Thus, it is advanced that this constituted a suppression of this testimony during the main portion of the trial, and deprived the defendant of strong corroborative evidence that the shooting was an accident. However, the defense to the crime was not accidental killing. It was excusable homicide as a result of insanity. Needless to say, such are miles apart. More importantly, a reading of the record discloses no significant variance as alleged. In Diehl's statement given immediately after

the occurrence, as quoted in the cross-examination of the defendant, he said,[6] "The sheriff got into the back seat and there was a struggle while I was trying to get the car stopped on the side of the road." During his testimony on the stand, Diehl did not use the word "struggle" but he did say that almost immediately as the defendant gained possession of the gun, the sheriff "grabbed him" and went over the seat before the car was brought to a stop. Certainly, this clearly indicates a struggle took place. But when the fatal shot was fired after the car had been stopped, Diehl testified that Lauer was then lying on the floor and the defendant was sitting on the seat on the opposite side of the car. There is nothing in Diehl's first statement, as disclosed in the record, that is at variance in the slightest degree with this testimony. Further, defense counsel was given every opportunity to elicit every possible fact and flaw in the testimony through extended cross-examination.

The next assignment of error is that the trial judge erred in refusing to charge in the specific manner requested by the defense on the issue of second degree murder. Two points submitted were refused on the ground that they had been adequately covered in the charge. They were as follows: (1) "If you find that the firing of the shot which killed Sheriff Lauer occurred in the course of a struggle between him and the defendant, and that the shot was fired unintentionally and accidentally and without any specific intent to take the Sheriff's life, then you cannot find him guilty of first degree murder. You may, however, find him guilty of murder in the second degree because even an accidental killing occurring in the commission of the crime of escape is murder in the second degree, pro-

---

[6] The defendant was asked whether or not what Diehl said was true.

vided however, that you are convinced that defendant is sane." (2) "Murder in the first degree requires a specific intent to kill, and if, under all of the evidence, you are convinced that this defendant, by reason of his mental illness or disorder, was incapable of forming a wilful, deliberate and premeditated design to kill, then he cannot be found guilty of first degree murder."

In regard to the first mentioned request for charge, we note that during the main part of the trial, there was not any substantive evidence on either side indicating the shooting was accidental. The details of the shooting as given by Diehl, the only eyewitness who testified, established a cold-blooded first degree killing. It precluded any conclusion that the shooting was accidental. Further, the court did charge correctly and adequately on the two classes of murder. He defined murder in the first degree and murder in the second degree. He made very clear the distinction and the differentiating ingredients. He reiterated repeatedly the necessity that the killing had to be wilful, deliberate, intentional and premeditated in order to sustain a first degree murder charge. He explained that to be intentional, it had to be a conscious and intelligent act. He charged "to be deliberate it must be done under such circumstances as establish a mind fully conscious of its purpose and design; and to be premeditated sufficient time must elapse between the original thought and the deed as to allow the mind to select the weapon or instrument and then carry the intention into execution." He emphasized the duty of the Commonwealth to prove the vital essentials of the crime beyond a reasonable doubt. He also gave comprehensive instructions on the issue of insanity as affecting the capacity of the defendant to commit the crime charged. The entire charge was fair, understandable and complete in these important respects.

It is elementary that the instructions to a jury must be read as a whole and the correctness and adequacy thereof determined from that reading: *Commonwealth v. Thompson,* 321 Pa. 327, 184 Atl. 97 (1936) ; *Commonwealth v. Gibbs,* 366 Pa. 182, 76 A. 2d 608 (1950). The trial court is not required to give a number of different instructions upon the same subject, and it is not error to refuse to give a requested instruction, although it states a correct principle of law applicable to the case, if it has been covered properly and sufficiently by other instructions already given: *Commonwealth v. Thomas,* 357 Pa. 68, 53 A. 2d 112 (1947) ; *Commonwealth v. Smith,* 374 Pa. 220, 97 A. 2d 25 (1953) ; *Commonwealth v. Zietz,* 364 Pa. 294, 72 A. 2d 282 (1950). A reading of the charge as a whole discloses that it was complete, correct, clear and fair.

The jury at seven o'clock p.m. sent a note to the trial judge requesting instructions on the distinction between murder of the first degree and murder of the second degree. Being supper hour, the judge was then unavailable. By the time he returned to the courthouse at seven-forty o'clock p.m., the jury had forwarded another note to the court saying, "Honorable Judge: after giving this note to the Tipstaff, we settled this question among ourselves and did not need this question answered to reach a verdict. Paul E. Weicht, Foreman." The verdict was recorded minutes later. Since the jury had cleared up the difficulties in their own minds without further assistance from the court, the trial judge was not required to proceed with any additional instructions before accepting the verdict. A jury may withdraw a request for additional instructions, if it sees fit. The poll of the jury clearly evidenced that each and every juror voted affirmatively for the verdict recorded.

It is alleged that the testimony of a witness, Harold Bonno, district attorney of Northumberland County,

was taken in judicial chambers in the absence of the defendant resulting in a denial of due process. The circumstances of this incident, inspired by counsel herself, are pointedly and correctly, we are convinced set forth in the lower court's opinion and need no further elaboration herein. The testimony involved was never used in the trial nor heard by the jury. It was not part of the trial and occurred while the same was not in actual session. It concerned the reasons behind the defendant's decision to abandon the writ of habeas corpus referred to in the early part of this opinion. It was merely coincidental to the murder trial and primarily for the purpose of ascertaining the necessity of subpoenaing to testify the judge of Northumberland County, who presided at the habeas corpus proceeding. The specific witness, Bonno, did subsequently testify during the trial before the jury with the defendant present. No possible prejudice resulted. It did not constitute reversible error. See *Commonwealth v. Ballem,* 386 Pa. 20, 29, 123 A. 2d 728, cert. den. 352 U. S. 932, 77 S. Ct. 235, 1 L. Ed. 2d 167.

Finally, it is contended that error was committed during the supplemental proceeding by the admission of prejudicial and derogatory statements made by the two judges before whom the defendant had been convicted by his own plea in the State of New York. During this portion of the trial, the Commonwealth offered in evidence the records of a series of prior convictions of grave criminal offenses by the defendant. They began in the year 1931 and included: robbery, carrying concealed weapons, armed robbery on two separate instances and in different jurisdictions and assault in the third degree. Two of these convictions resulted from pleas of guilty on separate occasions in the courts of Bronx County in the State of New York. The particular crimes involved were assault in the third degree and armed robbery committed in different years. The

entire record of these proceedings, certified under the Triplicate Seal of the State of New York, was offered in evidence *without any objection voiced thereto.* This included not only the record of the plea, conviction and sentence, and in addition, the statements and plea made by defendant's counsel on his behalf, the court's comments before imposition of sentence, and also a complete classification summary of the defendant's early home life and difficult environment. The statements made by defendant's counsel on these occasions and the data included in the classification summary were of such a nature as to be beneficial to the defendant. The history of his crimes, of course, was not. Also, the presiding judge's comments were not helpful. In one instance, the court described the defendant as "a cold-blooded stick-up man and a menace to society." While the reaction of the presiding judge is understandable in view of the defendant's history, these comments should have been deleted for the purposes of this case. See, *Commonwealth v. McCoy,* 405 Pa. 23, 172 A. 2d 795 (1961). However, we repeat, no objections to the records as offered were made by counsel, who is considered a thorough, discerning lawyer of extensive experience; nor was any motion to strike out entered. It is a reasonable inference that defendant's counsel at that time wished to have everything in connection therewith heard by the jury and concluded that this procedure might well help the defendant's cause and possibly save his life. The trial judge, in his opinion written for the court en banc, quotes counsel for the defendant as saying at sidebar the following: "I have no objections to Mr. Strauss reading the Judge's remarks providing he reads the entire statement including the remarks of the District Attorney." This is corroborated by the statement of the prosecuting attorney in this case made in open court that he had been requested to read the entire colloquy that occurred in the

New York proceedings. This statement was not challenged.

In conclusion, a minuté study of the entire record discloses that the defendant received a fair and impartial trial. The verdict is strongly sustained by the evidence and each and every ingredient of murder in the first degree is present. All of the assignments of error have been carefully considered and found to be without merit.

Judgment affirmed.

Mr. Justice COHEN dissents for the reasons set forth in his dissenting opinion filed in *Commonwealth v. McCoy*, 405 Pa. 23 (1961).

Mr. Justice BOK dissents.