567 A.2d 1055

**COMMONWEALTH of Pennsylvania**

v.

**Kurt E. SMALLHOOVER, Appellant.**

Superior Court of Pennsylvania.

Argued Aug. 23, 1989.

Filed Dec. 4, 1989.

Ernest W. Baum, Pittsburgh, for appellant.

Brian P. Gottlieb, Deputy Atty. Gen., Harrisburg, for Com.

Before CAVANAUGH, BROSKY and ROWLEY, JJ.

BROSKY, Judge.

This appeal is taken by Kurt E. Smallhoover from the judgment of sentence following his conviction of 75 Pa. C.S.A § 9510(c), willfully failing to pay the oil company franchise tax.

On appeal, he raises various constitutional and statutory challenges to the legislation empowering the imposition and collection of the oil company franchise tax and alleges sundry trial errors. We affirm.

Smallhoover is vice-president and general manager of the R. W. Geiser Company ("the Company"), a wholesale oil and gas distributorship. His mother, Mrs. Smallhoover, is the president of the company, and his father, Mr. Smallhoover, acts as Secretary–Treasurer. The tax which Smallhoover was found to have willfully failed to remit is an excise franchise tax imposed for highway maintenance and con-

struction. The tax is imposed at the rate of sixty mills for each dollar of an oil company's petroleum revenues for the privilege of exercising a corporate franchise, doing business, employing capital, owning or leasing property, maintaining an office or having employees in Pennsylvania. 75 Pa. C.S.A. § 9502(a).

The company was initially audited by the Commonwealth Department of Revenue in 1984 and was found to have been delinquent in its payment of the franchise tax for a seven-month period commencing January 1984 through July 1984. The field auditor attributed the company's delinquency at that time to a general confusion surrounding the enactment of the oil company franchise tax rather than to any criminal intent to defraud. Following the audit, the taxes were regularly remitted to the Department of Revenue. Subsequently, payment once again ceased, and Smallhoover was then charged with willful failure to pay the tax for the period July 1985 through and including December 1985 in the total amount of $50,384.57. Following his conviction and from his sentence of six consecutive terms of probation (for each of the six counts of willful failure to pay), fifteen hours of community service per month and restitution in the amount of $50,384.57, Smallhoover filed this timely appeal.

Smallhoover challenges the authority of the Commonwealth to prosecute him under the penal provision of the taxing statute, 75 Pa.C.S.A. § 9510(c), because he does not meet the statutory definition of a "person" who can be charged with violating the statute. The act defines "person" as "[a]ny oil company subject to tax under this chapter." 75 Pa.C.S.A. § 9501. The term "oil company", in turn, encompasses a "corporation, association, joint-stock association, partnership, limited partnership, copartnership, natural individual or individuals, and any business conducted by a trustee or trustees wherein evidence of ownership is evidenced by certificate or written instrument, formed or engaged in the sale or the importation of petroleum products within this Commonwealth." *Id.* In his appellate brief, Smallhoover argues, "The statute does not impose

vicarious liability upon those associated with the oil company [,] nor does it contain a provision to automatically pierce the corporate entity for purposes of imposing either civil or criminal penalties upon the officers, directors or employees of the corporation." At 18. We believe that Smallhoover's concern about a perceived defect in the statutory definition of "person" has been squarely addressed by this court in *Commonwealth v. Klinger*, 369 Pa.Super. 526, 535 A.2d 1060 (1987).[1]

In *Klinger*, appellant, who was the president and, with his wife, the sole owner of Fuel Marketing Corporation, sold fuels at a truck stop operated by the corporation. He collected the franchise tax but failed to remit it for a four month period. Klinger was arrested and charged with violation of 75 Pa.C.S.A. § 9510(c) and another taxing statute and was ultimately convicted. On appeal, Klinger argued that the oil company franchise tax statute does not contain any provision charging a corporate official with criminal responsibility for the acts or omissions of a corporate taxpayer. Klinger maintained that since the corporation was the oil company subject to payment of the franchise tax under the statute he, individually, could not be prosecuted for failure to pay the tax.

The panel considered and rejected this argument, relying on *Commonwealth v. Shafer*, 414 Pa. 613, 202 A.2d 308 (1964). There, the Supreme Court held that the president of a corporation who was charged with non-payment of sales tax collected by the corporation but not remitted in violation of Section 823 of the Penal Code of 1939 was subject to prosecution under the statute. The appellant in *Shafer* had argued that it was the corporation, rather than he, individually, who was criminally responsible under the statute. The *Klinger* court, citing *Shafer*, stated, "[i]ndivi-

---

1. The lead opinion was authored by Judge Olszewski. Judge Wicand concurred in result, and Judge Tamilia wrote a concurring opinion in which he agreed with the lead that Klinger was criminally liable for payment of the tax. But Judge Tamilia differed with the lead's treatment of the issue relating to the discretionary aspects of Klinger's sentence. That particular issue is not here before us.

duals are subject to indictment for acts done under the guise of a corporation where the individual personally so dominated and controlled the corporation as to immediately direct its action." 369 Pa. at 536, 535 A.2d at 1065, citing *Shafer* at 624, 202 A.2d at 313. We conclude that the record in the instant matter demonstrates that Smallhoover "personally dominated and controlled the affairs of the corporate taxpayer", *id.*, and, like the *Klinger* court, we, too, reject Smallhoover's assertion to the contrary and find him subject to criminal prosecution under the oil company franchise tax statute. *See* N.T. 46–49, 53–54, 70, 77, 80–83, 92, 97, 99–102, 106–07, 111–13.

■ In a related vein, Smallhoover alleges that because he was not charged in the information as an officer or agent of a corporation required to collect and remit the oil franchise tax, no statutory obligation can be imposed upon him, individually, for the payment of the tax under Section 9510(c). Instead, if he were responsible at all, Smallhoover continues, the controlling provision is Section 307(e) of the Crimes Code, 18 Pa.C.S.A. § 307(e), entitled "Persons acting or under a duty to act for organizations" [2] and that the failure of the information to include the specific language of Section 307(e) in addition to the reference to Section 9510(c) deprived him of the ability to effectively defend. However, this court's analysis in *Commonwealth v. Klinger, supra,* renders the above contention meritless.

**2.** This provision reads:

**(e) Persons acting or under a duty to act for organizations.—**
(1) A person is legally accountable for any conduct he performs or causes to be performed in the name of a corporation or an unincorporated association or in its behalf to the same extent as if it were performed in his own name or behalf.

(2) Whenever a duty to act is imposed by law upon a corporation or an unincorporated association, any agent of the corporation or association having primary responsibility for the discharge of the duty is legally accountable for a reckless omission to perform the

■ Smallhoover's claim that the information does not allege that he was an officer or agent of a corporation required to collect and remit the applicable tax is belied by the very language of the information, itself:

[T]he above named defendant, who was *the vice-president and general manager* of R. W. Geiser Company, Inc., a Pennsylvania business corporation engaged in the sale of petroleum products, and who was a person required by law to charge, collect and remit to the Department of Revenue of the Commonwealth of Pennsylvania the excise tax described in the Oil Company Franchise Tax Act on behalf of said business, did willfully fail, neglect or refuse to pay said taxes at the time required by law, in violation of the Act of June 23, 1981, P.L. 98, No. 35, § 3, 72 [sic] Pa.C.S. § 9510(c)....

Emphasis supplied. We read the above language as charging Smallhoover as the person who, in his capacity as vice-president and general manager of the corporation, was required to collect and remit the applicable oil franchise tax to the Commonwealth. Acting in the capacity of a corporate representative or agent, Smallhoover is, indeed, a person designated by statute to collect and remit the oil franchise tax.

■ Smallhoover also maintains that the trial court refused to instruct the jury on his requested point for charge on the statutory definition of "person." The Commonwealth responds that this issue is waived and cites *Commonwealth v. Rineer*, 310 Pa.Super. 241, 456 A.2d 591 (1983), to support this claim. In *Rineer*, the appellant submitted a written point for charge which the trial court denied because it was covered in the general charge. Counsel took an exception. At the end of the charge, the court inquired whether counsel had any additions or corrections to the charge. Rineer's counsel responded negatively and did not object to the court's refusal to read the requested

required act to the same extent as if the duty were imposed by law directly upon himself.

. . . . .

point for charge. The *Rineer* court, relying on Pa.R. Crim.P. 1119(b),[3] held:

> [I]n order to preserve an issue regarding the charge to the jury, a specific objection must be made pursuant to Pa.R.Crim.P. 1119(b), even where jury instructions have been timely offered and refused. As noted in [*Commonwealth v.*] *Martinez*, [475 Pa. 331, 380 A.2d 747 (1977)] this will absolutely ensure that the trial court is given an opportunity to avoid error.

310 Pa.Super. at 249, 456 A.2d at 595; footnote omitted. Because the identical scenario ensued at the instant trial, we find that this alleged error has been waived. *Id.; See also Commonwealth v. Klinger, supra.*

Moreover, this argument is meritless in any event. In reviewing a trial court's instructions to the jury, it is the charge, taken as a whole, which controls. Therefore, an appellate court will not find error in an isolated excerpt of the charge. Even if the instruction is erroneous, reversal is mandated only if the error prejudiced the appellant. *Id.* The trial court charged as follows:

> In this case, the evidence shows that the business which sold the fuel, and subject to the tax, was a corporation and the defendant is alleged to be an individual who was acting on behalf of the corporation. In this regard, I charge you that *if a person so dominates and controls the affairs of the corporation as to immediately direct its action,* then he is legally accountable for any conduct he performs or causes to be performed in the name of the corporation or on its behalf to the same extent as if it were performed in his own name or behalf.
>
> Thus, the defendant would be guilty of a crime if he acted or omitted to act—correct that—thus, a defendant would be guilty of a crime if he acted or admitted [sic] to an act in his own name or behalf [sic] is equally guilty if the act

3. Pennsylvania Rule of Criminal Procedure 1119(b) reads:
 (b) No portions of the charge nor omissions therefrom may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate. All such objections shall be made beyond the hearing of the jury.

or admission [sic] is done in the name or on behalf of the corporation, *provided that the person so dominated and controls [sic] the affairs of the corporation as to immediately direct its action.*

N.T. 178–79; emphasis added. The language of the above charge tracks that used by the *Klinger* court in discussing the appellant's culpability there. Therefore, we conclude that the trial court unerringly charged the jury on Smallhoover's liability as a person responsible for collection and remittance of the franchise tax.

Smallhoover next cites three instances of alleged trial error. The first relates to the refusal to grant a mistrial because the Commonwealth intimidated a witness and forced the latter to claim his privilege against self-incrimination. The witness in question was Smallhoover's father, Mr. Smallhoover. Smallhoover argues that the Commonwealth sought to prevent his father's testimony because it would have impeached that given by the Revenue Agent, Mr. Fullerton. He claims that the Commonwealth threatened to prosecute his father for unsworn falsification to authorities if the latter testified. It is alleged that this threat caused Mr. Smallhoover to assert his privilege against self-incrimination instead of so testifying and that, as a result of this prejudicial event, Smallhoover was deprived of a fair and impartial trial, thus necessitating a mistrial.

The record discloses that the Commonwealth sought an offer of proof from the defense at the opening of the latter's case concerning the proposed testimony of Mr. Smallhoover. The purpose of the offer was to discover whether Mr. Smallhoover's proposed testimony would contradict the memorandum of Revenue Agent Fullerton. That memorandum contained a statement to the effect that Mr. Smallhoover did not know until three months after the period of delinquency that the franchise tax was not being paid. According to the offer of proof, Mr. Smallhoover's proposed trial testimony would have contradicted the Agent's memorandum in that respect. The Commonwealth,

concerned that Mr. Smallhoover's proposed testimony would serve to incriminate him and be the basis of a charge of unsworn falsification to authorities, in addition to subjecting him to criminal liability for non-payment of the franchise tax, proposed to the court that the witness be advised of his right to assert the privilege against self-incrimination and that he be given the corresponding entitlement to consult with independent counsel concerning the potential consequences of his proposed testimony.

Smallhoover's counsel conceded in Chambers that the court properly afforded Mr. Smallhoover an opportunity to seek the advice of independent counsel and that independent counsel advised Mr. Smallhoover to respond to any material inquiry by asserting his privilege against self-incrimination. Smallhoover claimed at trial and now asserts again on appeal that the Commonwealth's threat of prosecution prevented Mr. Smallhoover from testifying to contradict the contents of the Agent's memorandum and, therefore, seriously prejudiced Smallhoover's defense.

█ The record does not support Smallhoover's assertion that the Commonwealth's informing the court and Smallhoover that Mr. Smallhoover's proposed testimony could subject him to charges for the same tax violation as well as for other criminal offenses and that the Commonwealth's suggestion that Mr. Smallhoover be given the opportunity to consult with independent counsel concerning the feasibility of asserting his privilege against self-incrimination if called to testify constituted a coercive influence on Mr. Smallhoover's decision not to testify. *Commonwealth v. Allen,* 501 Pa. 525, 462 A.2d 624 (1983), *citing Commonwealth v. DiGiacomo,* 463 Pa. 449, 345 A.2d 605 (1975) (no impropriety for prosecutor to advise witness of right to assert privilege against self-incrimination where evidence suggests complicity in the crime).

· █ It is significant that Mr. Smallhoover's decision not to testify resulted from his consultation with independent counsel. Mr. Smallhoover was not present at the

side-bar discussion between counsel for both sides and the court. Nothing in the record even intimates that the prosecutor directly approached or contacted Mr. Smallhoover concerning his proposed testimony. Therefore, he was not subjected to any potentially intimidating or harassing tactics of the prosecutor in any event. Moreover, he was informed of the court's decision to allow him the opportunity to consult with independent counsel by his son's counsel, not the prosecutor. The only purpose in calling Mr. Smallhoover after the side-bar and in-chambers exchange would have been the impermissible one of allowing the jury to draw an adverse inference from Mr. Smallhoover's assertion of the privilege. *Commonwealth v. Cieri*, 346 Pa.Super. 77, 499 A.2d 317 (1985); *Commonwealth v. Bellachio*, 296 Pa.Super. 468, 442 A.2d 1147 (1982). If the witness intends to assert the privilege as to virtually all questions at trial, the court may, in its discretion, refuse to allow him to take the stand. Neither party has the right to derive a benefit from any inferences which the jury may draw merely because the witness asserts the privilege. *Id.*

Furthermore, we cannot ascertain the value of Mr. Smallhoover's testimony to the defense in any event, since it would not have exculpated Smallhoover in the instant offense, nor would it have served to impeach the reliability and credibility of Revenue Agent Fullerton. Therefore, his first claim of trial error is meritless.

 Smallhoover's next claim of error is based upon the trial court's purportedly erroneous refusal to grant a continuance of one week to secure the attendance of a witness to the interview between Revenue Agent Fullerton and both Smallhoovers. Smallhoover maintains that this witness was necessary to his defense since Mr. Smallhoover declined to testify on the basis of testimonial privilege. It is well-settled that the grant or denial of a continuance to procure an absent witness lies within the discretion of the trial court. Among the factors to be considered by the court in exercising that discretion are whether the absent witness is necessary to the defense, the facts to which the witness would

testify, a party's diligence in procuring the witness and the likelihood that the witness can be produced for trial. *Commonwealth v. Plath*, 267 Pa.Super. 1, 405 A.2d 1273 (1979); *Commonwealth v. Foreman*, 248 Pa.Super. 369, 375 A.2d 142 (1977).

Instantly, Smallhoover was aware well before trial that the sought-to-be-procured witness, Mr. Bilstine,[4] was present at the initial interview between the Revenue Agent and the Smallhoovers because his name was mentioned in the memorandum of Revenue Agent Fullerton which counsel for Smallhoover had in his possession prior to trial. Smallhoover's counsel, nevertheless, only attempted to contact Mr. Bilstine on the afternoon of the final day of trial. Counsel informed the court that Mr. Bilstine was vacationing in the Bahamas and that efforts to reach him by telephone had been fruitless. He requested the court to continue the trial until the following week when, according to counsel, Mr. Bilstine would have returned from vacation. Counsel admitted that he did not know exactly what Mr. Bilstine's testimony would be. He could only represent to the court that the testimony would concern Mr. Bilstine's recollection of the statements made at the interview.

However, the above circumstance is no basis upon which a court would be warranted in granting a continuance. Smallhoover's counsel has provided no explanation for his failure to contact Mr. Bilstine until the afternoon of the day on which the defense was to present its case. This evidences a lack of diligence upon the part of counsel for Smallhoover. Mr. Bilstine's statements were available as part of the agent's memorandum, a copy of which was given to counsel for Smallhoover before trial. Additionally, in chambers, Smallhoover's counsel advised the court that although he knew that the general nature of Mr. Bilstine's testimony would relate to the latter's recollection of the events of the interview, he did not know the specifics of this

4. A discrepancy appears to exist in the spelling of this witness' name between the record and the parties' briefs. We have chosen the spelling as indicated in the record.

testimony. Counsel did not set forth how Mr. Bilstine's testimony would aid his client; rather, it appears that Mr. Bilstine's testimony would be merely cumulative of the representations made by Mr. Smallhoover at the interview, which representations were part of the Agent's memorandum. Therefore, the trial court did not abuse its discretion in refusing to grant a continuance of one week to obtain the testimony of Mr. Bilstine. *See id.*

Moreover, we are at a loss to understand why Mr. Bilstine's testimony would be sought in the first instance. It is our understanding, from reading the record, that Mr. Bilstine would have related the identical testimony to which Mr. Smallhoover had claimed his privilege against self-incrimination. For this additional reason, we believe that the trial court was correct in refusing to grant a continuance to secure Mr. Bilstine's testimony.[5]

Smallhoover's final allegation of trial error relates to the refusal of the trial court to admit into evidence the handwritten notes and typewritten memorandum of Agent Fullerton as a prior inconsistent statement. Agent Fullerton testified at trial that Mr. Smallhoover was not aware of the non-payment of the taxes until after the period of delinquency, or March 1986. Smallhoover claims that this statement is inconsistent with the Agent's memorandum which made no mention of the precise time when Mr. Smallhoover became aware of the delinquency.

A party may impeach the credibility of an adverse witness by the introduction of evidence showing that the witness has made a prior statement inconsistent with the statement given at trial. *Commonwealth v. Bailey,* 322 Pa.Super. 249, 469 A.2d 604 (1983). The only essential difference between the memorandum of the interview which

---

5. Contrary to the assertion of my esteemed colleague, Judge James R. Cavanaugh, as set forth in his concurring opinion, we do not implicate in any way that the exercise of the privilege against self-incrimination may be used to prevent another party from testifying. Mr. Smallhoover's claim of privilege did not pertain to any proposed testimony of Mr. Bilstine. Instead, Mr. Smallhoover exercised the privilege in lieu of the giving of his own testimony.

Agent Fullerton had prepared and his testimony at trial was that at the latter, he mentioned a specific time frame after which Mr. Smallhoover only then knew that the taxes had not been paid. His memorandum does not mention this time frame. However, nothing in the Agent's testimony is at variance with that which was contained in the memorandum. Both indicated that Smallhoover was the one in charge of the daily operation of the corporation as general manager and was the one responsible for payment of the taxes which were delinquent. The memorandum did not constitute a verbatim account of what Mr. Smallhoover stated to Revenue Agent Fullerton. It was only a summary of those words. *Id.* *See also Commonwealth v. Butler,* 405 Pa. 36, 173 A.2d 468 (1961).

The trial court admitted the memorandum for the purpose of cross-examination. N.T. 143. Interestingly, Smallhoover's counsel, on cross-examination of this witness, never inquired when Mr. Smallhoover became aware of the delinquency, even though the former used the contents of this memorandum extensively to ascertain Mr. Smallhoover's involvement the affairs of the corporation and his responsibility for payment of the taxes. Hence, Smallhoover cannot be heard to complain now on appeal.

Lastly, Smallhoover attacks the tax legislation as being violative of due process on the basis of vagueness and as an unauthorized exercise of the police power of this Commonwealth. We address the issue of vagueness first.

 To comport with the due process requirement of notice, a criminal statute must reasonably apprise a person charged with its violation of the conduct so proscribed. *Commonwealth v. Heinbaugh,* 467 Pa. 1, 354 A.2d 244 (1976). Our Supreme Court described the standard of reasonable notice in a criminal statute as follows:

That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the

settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.

At 5, 354 A.2d at 246, *citing Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). "[W]hen an ascertainable standard is present in a statute, the violator whose conduct falls clearly within the scope of such standard has no standing to complain of vagueness." 467 Pa. at 7, 354 A.2d at 246. It is now our task to determine whether the legislation in question evinces this standard.

Smallhoover was charged with a six-count violation of willful failure to pay the oil franchise tax. 75 Pa.C.S.A. § 9510(c). Section 9510 is entitled "Penalties", and subsection (c) thereof is designated "Failure to file report or permit examination." Section 9510(c) calls for the payment of a fine and/or the imposition of a term of imprisonment for violation of its provisions. Therefore, Section 9510 is to be construed as a criminal statute within the legislative scheme. Appellant's only claim of vagueness with respect to this statute is that the legislation "lacks the definition and certainity [sic] necessary to inform [him] of the precise acts which the legislature intended to prohibit and for which acts he could be held criminally accountable." Brief, 28. Section 9510(c), the statute under which Smallhoover stands charged, reads:

(c) Failure to file report or permit examination.—Any person who willfully fails, neglects or refuses to make a report or to pay the tax as prescribed in this chapter or who shall refuse to permit the department to examine the books, papers and records of any person liable to pay tax under this chapter, shall be guilty of a misdemeanor of the third degree and, upon conviction thereof, shall be sentenced to pay a fine not exceeding $2,500 or to undergo imprisonment not exceeding one year, or both. Such

penalty shall be in addition to any other penalties imposed by this chapter.

■ Smallhoover's assertion to the contrary, we perceive nothing vague about the terms of this penal statute. Its proscriptions are clear, definite and make room for no guesswork as to an ascertainable standard to be followed in avoiding violation of the statute. This argument amounts to nothing more than a reiteration of his earlier claim that the statute fails to include language which would impose liability upon a corporate officer for inculpatory acts or omissions of the corporation. We have already considered and rejected that argument elsewhere in this Memorandum. We conclude that the type of conduct exhibited by Smallhoover fell clearly within the scope of this ascertainable standard. Therefore, he has no standing to complain of the statute's vagueness.

■ However, the primary targets of Smallhoover's vagueness challenge are Section 9501 and 9502. The former is the definition section and the latter concerns imposition of the franchise tax. Specifically, Smallhoover assails the definition of "petroleum revenue" then in effect[6] because it did not set forth on whom the responsibility for collection the tax, as opposed to payment, lay. He notes that the information charges him with failing to "collect" the franchise tax. However, he was also cited for failing to charge and remit the tax. Naturally, in order to remit the tax, the selling entity must first charge for and collect the applicable tax. Moreover, Section 9502(j) provides for a one-time *collection* of the tax on any petroleum product sold or used in the Commonwealth.

■ In his final attack on the vagueness of this legislation, Smallhoover alleges the complexity and confusing nature of the taxing scheme. However, as the Supreme Court noted in *Heinbaugh:*

Statutes which are challenged on the ground of vagueness are not, however, to be tested against paradigms of

6. *See* Historical Note on the 1986 amendment following Section 9501.

legislative draftsmanship. The fact that [the legislature] might without difficulty have chosen "clear and more precise language" equally capable of achieving the end which it sought does not mean that the statute which it in fact drafted is unconstitutionally vague.' ... Rather, the requirements of due process are satisfied if the statute in question contains *reasonable* standards to guide the prospective conduct.

467 Pa. at 6, 354 A.2d at 246; emphasis in text; citations omitted. Furthermore, Revenue Agents Fullerton and Meade testified that Smallhoover had indicated to them that he understood the procedure of paying the tax and filling out the forms and that he had previously filled out properly prepared tax forms and had paid the tax. Agent Fullerton further testified that Smallhoover indicated to him that the latter had decided not to pay the taxes for the period in question because of a cash flow problem. It stands to reason, therefore, that Smallhoover's assertion of vagueness on the basis of the confusion generated by any complex language in the tax statute fails.

Smallhoover finally attacks the oil franchise tax scheme as being an unconstitutional exercise of the police power of this Commonwealth. As with all his other contentions, this issue is equally meritless.

 Smallhoover concedes that the purpose of the measure is to generate revenue for highway maintenance and construction. He argues, however, that legislation designed solely as a means for raising revenue cannot be enforced by the exercise of the police power of this Commonwealth. It is true that a legislative enactment designed solely or chiefly to produce revenue cannot be justified as a valid exercise of the police power. *Borough of Schuylkill Haven v. Bolton*, 190 Pa.Super. 157, 153 A.2d 504 (1959). However, the Commonwealth does not even attempt to argue that the oil franchise tax is a police power measure. Instead, the Commonwealth readily acknowledges that the statute in question was enacted solely to generate revenue.

 The short answer to Smallhoover's claim in this regard lies, we believe, in the authority of the Constitution promulgated by the citizens of this Commonwealth. *See id.* Article 8, Section 11 of this document specifically empowers the legislature to impose excise taxes on products used in motor transportation and to disburse the revenue generated therefrom for the construction, maintenance and repair of highways and bridges:

### § 11. Gasoline taxes and motor license fees restricted

(a) All proceeds from gasoline *and other motor fuel excise taxes,* motor vehicle registration fees and license taxes, operators' license fees *and other excise taxes imposed on products used in motor transportation* after providing therefrom for (a) costs of administration and collection, (b) *payment of obligations incurred in the construction and reconstruction of public highways and bridges* shall be appropriated by the General Assembly to agencies of the State or political subdivisions thereof; *and used solely for construction, reconstruction, maintenance and repair of and safety on public highways and bridges and costs and expenses incident thereto, and for the payment of obligations incurred for such purposes....*

Emphasis added. The enabling legislation is consistent with the above purpose.

### § 9502. Imposition of tax

(a) General rule.—Every oil company incorporated or organized now or hereafter by or under any law of this Commonwealth, or of any other state, territory or by the United States or any foreign government or dependency, and *doing business in this Commonwealth, shall pay an 'oil company franchise tax for highway maintenance and construction' which shall be an excise tax of 60 mills upon each dollar of its petroleum revenues* for the privilege of exercising its corporate franchise or of doing business, or of employing capital, or of owning or leasing property in this Commonwealth in a corporate or organized capacity, or of maintaining an office in this

Commonwealth, or of having employees in this Commonwealth, for all or any part of any calendar year.

75 Pa.C.S.A. § 9502; emphasis added.

The penalty provision of Section 9510(c) is merely an effective means by which to enforce collection. If Smallhoover continues to operate the oil and gas distributorship without paying the applicable franchise tax, the purpose of any penalty exacted from him is for willful failure to pay the tax, not for failing to obtain permission from a state licensing agency to operate the business. The latter represents a valid police power measure which is not here applicable. The legislation here in question, then, is not at all an exercise of the police power of this Commonwealth.

■ This court, in *Freeman v. City of Philadelphia*, 178 Pa.Super. 290, 116 A.2d 349 (1955), explained the role of a penalty provision enacted as part of legislation which the court deemed to be a revenue measure rather than a licensing provision:

> [W]e can see no more effective manner of enforcing than by providing penalties for engaging in the occupation [of auctioneering] without paying the tax. We agree that the police power is used to *enforce* the measure, but it is so used in all revenue measures and it does not follow that the ordinance was *enacted* under the police power.... If he conducts his business without paying the tax[,] he pays a penalty for his failure to pay the tax, not because he failed to obtain permission to enter the business.

At 294–95, 116 A.2d 352; emphasis in text. Smallhoover offers two final arguments related to this issue. First, he makes a broad allegation that Section 9510 contravenes Article 1, Section 16 of the state constitution which prohibits imprisonment for civil indebtedness. Smallhoover did not receive a sentence of imprisonment on his conviction. Moreover, a sentence of confinement received pursuant to Section 9510 is the result of a *penal* violation of the statute. Since we have already determined that the applicable tax legislation does not fall within the ambit of the police

power, no merit exists to this contention. Secondly, Small-hoover contends that his prosecution is an usurpation of the police power because he cannot be criminally charged as a person in violation of the legislation. This latter offer amounts to nothing more than a variation of Smallhoover's earlier argument which we have already rejected.

Judgment of sentence affirmed.

CAVANAUGH, J., filed a concurring opinion.

CAVANAUGH, Judge, concurring:

I agree with the results reached by the majority. However, I write separately to explain why I believe the trial court was well within its discretion when:

1) it did not grant a mistrial subsequent to Mr. Fred Smallhoover's exercise of his right against self-incrimination and refusal to testify;

2) it declined to grant a mid-trial one week continuance to secure the attendance of a witness whose testimony would have been of dubious utility to the defense and whose presence or deposition counsel had not previously attempted to procure.

As the majority has explained, counsel for the defense had been prepared to introduce testimony by Mr. Fred Smallhoover, father of the defendant and initial purchaser, principal shareholder and secretary-treasurer of R.W. Geiser Company, Inc. As represented by the defense, the substance of his testimony was to describe the degree of authority he exercised over the defendant. In addition, he would testify that Revenue Agent Fullerton, an important Commonwealth witness, incorrectly reported the date on which Fred Smallhoover said he learned of the tax delinquency in a typed memorandum Mr. Fullerton prepared subsequent to an investigatory meeting attended by Mr. Fullerton, the Smallhoovers, and the Smallhoovers' attorney, Robert Bilstine. Specifically, Mr. Fullerton reported that Fred Smallhoover said he did not know of the delinquency until March, 1986, three months after the delinquen-

cy period was over, while Mr. Smallhoover would claim that he had told the agent he knew about non-payment by September, 1985, three months into the delinquency period.

The majority's interpretations to the contrary representations by defense counsel illustrate that the value of Fred Smallhoover's testimony did not lie solely in its concededly remote exculpatory potential, but rather in the possibility that Mr. Fullerton's reliability and credibility would be impeached thereby. Nonetheless, appellant's arguments must fail because the Commonwealth, far from intimidating the witness to deprive defendant of his rights, properly called to the attention of the trial court the very real possibility that Fred Smallhoover might inculpate himself by testifying.

Appellant may be accurate in pointing out that the Commonwealth was mistaken when the latter hypothesized that Fred Smallhoover might be liable for unsworn falsification to authorities. However, it is incorrect in stating that Fred Smallhoover's testimony could not have inculpated him for violating the same tax statute under which his son was charged. During the course of trial, defense counsel attempted to show that Kurt Smallhoover, who was in his early 20's, did not have sufficient corporate control and domination for liability to attach. It did so by introducing evidence that his father had ultimate oversight and control of the corporation's activities. Now appellant seeks to persuade us that Fred Smallhoover's full-time job elsewhere and his lack of day-to-day involvement in Geiser evinced a lack of corporate control and domination, categorically placing him outside the reach of the tax statute's penalty provisions, to illustrate that the Commonwealth lacked any reasonable basis for suggesting that Fred Smallhoover consult with independent counsel. This inconsistency alone renders appellant's contentions suspect.

Nevertheless, as a practical matter, even the evidence adduced in the trial of his son would probably be adequate for a trier of fact to find beyond reasonable doubt that Fred Smallhoover, in addition to his son, maintained sufficient

control to be convicted under the statute as a principal, accomplice, or accessory. The element which the Commonwealth would then need to prove is whether Fred Smallhoover possessed the requisite intent, that being a willful failure to pay the tax.

It is apparent from the in-chambers discussion (on the record) concerning Fred Smallhoover's possible testimony that the Commonwealth might very well have sought prosecution of father as well as son, at least on some of the same counts, if it previously had evidence that Fred Smallhoover knew about the non-payment of the tax during, instead of after, the period when it was supposed to be paid. Fred Smallhoover's testimony might actually have provided the Commonwealth with a prima facie case against him.

It matters not what the "true" motives of the prosecutor were in suggesting that Fred Smallhoover be given opportunity to seek independent counsel; the prosecutor's actions in notifying the trial court and defense counsel of the possibility of prosecution were presumptively proper because prosecution was a licit possibility, not a "hollow" threat. Thus, the court was correct in denying the motion for mistrial.

Related to Fred Smallhoover's last minute decision not to testify is the issue of whether the trial court was within its discretion in refusing a mid-trial week long continuance so that the defense could secure the presence of a witness, Mr. Robert Bilstine, who was present at the meeting with Revenue Agent Fullerton and the two Smallhoovers and whose testimony, in lieu of Fred Smallhoover's, might have impeached Mr. Fullerton's credibility.

Initially, I disagree with the majority when it finds as one justification for the trial court's denial of the continuance the fact that the testimony Mr. Bilstine would have related was identical to that for which Fred Smallhoover claimed a privilege against self-incrimination. The majority's implication that a privilege against self-incrimination can be exer-

cised to prevent *another* party from testifying is without foundation.[1]

I also question whether it is correct to say that Mr. Bilstine's testimony would have been "merely cumulative of the representations made by Mr. [Fred] Smallhoover at the interview, which representations were part of the Agent's memorandum," as the majority has characterized the situation. Rather, the defense sought to call Mr. Bilstine hoping that he would contravene the *accuracy* of Mr. Fullerton's memorandum transcription of Fred Smallhoover's statements, thus impeaching the credibility of Mr. Fullerton's testimony based on that memorandum. Keeping in mind that this is a criminal prosecution, the combination of Fred Smallhoover's continuing unavailability and Mr. Bilstine's absence from the country may have warranted the grant of a continuance had Fred Smallhoover's unavailability been an unfair surprise which unnecessarily deprived defendant of the ability to defend himself.

The fact is, however, that prior to trial the defense possessed all of the information by which counsel could reasonably have anticipated that Mr. Bilstine's presence was desirable. Defense counsel knew that Mr. Bilstine attended the meeting. It had a copy of Mr. Fullerton's memorandum. It sought to call Fred Smallhoover for the precise purpose of contradicting representations made in that memorandum to the effect that Fred Smallhoover knew nothing until after the delinquency period. Given that defense counsel expended considerable effort at trial proving that father, not son, controlled the Geiser corporation, it should have come as no surprise when Fred Smallhoover ultimately decided to exercise his right not to incriminate himself with respect to his knowledge that the tax was not being paid during the relevant period. Thus, defense counsel could reasonably have anticipated that a back-up witness was necessary.

1. Since the majority and myself agree that the trial court did not err in refusing to continue the trial, we need not discuss whether Mr. Bilstine's testimony was otherwise admissible.

Yet defense counsel did not seek to interview Mr. Bilstine on this precise issue before trial and, as a consequence of this failure alone, could not even represent to the trial court the anticipated substance of his testimony, let alone produce him for trial. Conjecture as to whether Mr. Bilstine's testimony would have aided the defendant is mere speculation; nevertheless, I do agree with the majority that the lack of diligence on the part of defense counsel was responsible for Mr. Bilstine's unavailability. Under these circumstances, the trial court was amply justified in refusing to continue the trial.