681 A.2d 746

COMMONWEALTH of Pennsylvania, Appellee,

v.

Judy Ann SHOWERS, Appellant.

Superior Court of Pennsylvania.

Argued April 25, 1996.

Filed June 20, 1996.

138

William Costopoulos, Lemoyne, for appellant.

Anthony J. Rosini, Assistant District Attorney, Shamokin, for Commonwealth, appellee.

Before McEWEN, President Judge, SAYLOR, J., and MONTEMURO, Senior Judge*.

MONTEMURO, Judge*:

This appeal arises from Appellant Judy Ann Showers' conviction for first degree murder following a jury trial before the Honorable Barry F. Feudale of the Court of Common Pleas of Northumberland County. The mandatory sentence of life imprisonment was imposed. Now represented by new counsel, Appellant brings this appeal. We affirm.

On September 2, 1992, state police Trooper Robert McBride responded to the scene of an apparent suicide at the residence of Appellant and her husband, Delbert Showers, whose body was found lying on their couch. Norman Showers, the deceased's brother, had already arrived on the scene and discovered what appeared to be a suicide note under the body. The note explained the deceased's reasons for committing suicide and what drugs he took to accomplish it. The deceased died of an oral overdose of a mixture of Serax, an anti-depressant drug, and liquid morphine. The Serax was obtained by prescription, while the morphine had been taken from Helen Wolfe, a friend of the Showers and the former lover of the deceased.

On the day of her husband's death, Appellant, a licensed practical nurse, had been alone in the house with him. During Trooper McBride's investigation, the police determined that the note was not written by the deceased. In February of 1993, Trooper McBride again interviewed Appellant who admitted that she wrote the note because she feared she would be accused of killing her husband. Based upon inconsistencies in her story and other information which she provided, Appellant was charged with first degree murder.

At trial, the Commonwealth introduced evidence of Appellant's motive for the killing. At the time of his death, the deceased was romantically involved with Sylvia Knecht, the younger sister of Helen Wolfe. Appellant knew of this affair.

* Retired Justice assigned to Superior Court.

Years earlier, Appellant had also discovered his affair with Helen Wolfe. In addition, there was evidence that Appellant herself had in the past been involved in extramarital relations. There were also indications of a financial motive, evidence to the effect that although the deceased was financially well-off, he was "tight" with money.

Appellant attempted to establish that the death was a suicide by evidence that the deceased had sought treatment for depression in the past, and that he had discussed suicide.

After a one-week trial, the jury found Appellant guilty of murder in the first degree. On appeal, Appellant raises eight issues, which have been edited for clarity:

1. Was the evidence insufficient to sustain the verdict because the Commonwealth failed to prove beyond a reasonable doubt that Delbert Showers was murdered by Appellant as opposed to having committed suicide or, alternatively, was the verdict against the weight of the evidence?

2. Did the trial court err in permitting the Commonwealth to introduce evidence of Appellant's bad reputation for truthfulness?

3. Was trial counsel ineffective for not extensively cross-examining Dr. John Hume, the Commonwealth's expert witness, who testified that the deceased was not a suicide risk?

4. Did the trial court err in admitting allegedly irrelevant, remote, and highly prejudicial evidence that Appellant had instructed Diane Showers, Appellant and the deceased's daughter, to administer medication to the deceased without his knowledge several years before his death?

5. Did the trial court err in denying a motion for a mistrial when Trooper McBride testified that he felt there was a reasonable doubt that the deceased committed suicide?

6. Did the trial court err in: a) allowing the Commonwealth to grant limited use immunity to Diane Showers solely to impeach her testimony by a later witness; b) allowing the Commonwealth to treat her as a hostile witness; c) limiting the cross-examination of her to matters

granted in the use immunity; and d) not compelling the Commonwealth to give full use immunity for all her testimony or preclude her from testifying pursuant to her invocation of her right against self incrimination?

7.   Did the trial court err in allowing Janette Andrews to testify when she was called only to impeach Diane Showers and her testimony, which was hearsay, went beyond the scope of the offer of proof and the grant of immunity?

8.   Did the trial court err in allowing the Commonwealth to cross-examine the defense forensic psychiatrist concerning a report that the deceased discovered that Appellant was having an affair in the mid–1970's?

### 1.   Sufficiency and Weight of the Evidence

Appellant's first point of error is that the evidence was insufficient to sustain a first degree murder conviction. She points to evidence that the deceased had a long history of chronic depression; had been hospitalized and under medical treatment for depression; had told several people shortly before his death that he intended to commit suicide; and was a high risk to commit suicide according to a forensic psychiatrist.

In examining a sufficiency of evidence claim, we must determine whether the evidence and all reasonable inferences from it, viewed in a light most favorable to the Commonwealth as verdict winner, were sufficient to establish all the elements of the crimes charged beyond a reasonable doubt. *Commonwealth v. Zimmick*, 539 Pa. 548, 554, 653 A.2d 1217, 1220 (1995).  To prove murder in the first degree, the Commonwealth must show that a human being was unlawfully killed, that the accused committed the killing, and that she did so in an intentional, deliberate, and premeditated manner. *Commonwealth v. Paolello*, 542 Pa. 47, 63–65, 665 A.2d 439, 448 (1995).  The key element distinguishing first degree murder from other degrees of criminal homicide is the presence of a willful, premeditated, and deliberate intent to kill.  *Id.*

██ Within this first issue, Appellant also challenges the weight of the evidence. The weight of the evidence is exclusively for the finder of fact who is free to believe all, some, or none of the evidence. *Commonwealth v. Simmons*, 541 Pa. 211, 229, 662 A.2d 621, 630 (1995), *cert. denied,* — U.S. ——, 116 S.Ct. 945, 133 L.Ed.2d 870 (1996). In addition, questions of credibility of witnesses are within the factfinder's exclusive province. *Id.* We will only reverse a verdict if it is so contrary to the evidence to shock our sense of justice. *Id.*

██ In addressing this issue, the trial court Opinion thoroughly examines the evidence supporting the first degree murder conviction. Therefore, to that extent, we adopt its Opinion as our own. After reviewing the parties' respective briefs, the record and notes of testimony, and the trial court's Opinion, we hold that there was sufficient evidence to convict Appellant of first degree murder. Furthermore, we hold that the verdict was not against the weight of the evidence as it does not shock our sense of justice.

In response to Appellant's contention that trial counsel was ineffective for not raising a weight challenge before the trial court, we note that the contention is moot because the trial court did address the weight of the evidence.

## 2. Evidence of Appellant's Reputation for Truthfulness

Appellant's second issue is that the trial court erred in allowing the Commonwealth to present three witnesses who testified to her reputation for dishonesty. Appellant alleges three errors concerning the character evidence: first, although she testified at trial, she did not place her reputation for honesty at issue; second, the character evidence was based on remote knowledge; and third, one witness, to Appellant's prejudice, testified beyond the scope of character evidence.

██ The admission of evidence is a matter reserved for the trial court whose decision, absent an abuse of discretion, we will not disturb. *Commonwealth v. Williams*, 541 Pa. 85, 94, 660 A.2d 1316, 1321 (1995), *cert. denied,* — U.S. ——, 116 S.Ct. 717, 133 L.Ed.2d 671 (1996). Appellant contends that a

defendant in a criminal case does not place her reputation for honesty at issue merely by taking the stand.  She alleges that the trial court had a "serious misunderstanding" of character reputation evidence in a criminal trial.  However, it is Appellant who confuses the character evidence issue.  The error in Appellant's argument manifests itself in her contradictory contentions that: 1) a defendant does not place her credibility at issue by testifying at trial; 2) *crimen falsi* convictions are admissible to impeach the credibility of a defendant who testifies; and 3) evidence of a testifying defendant's reputation for untruthfulness cannot be used to impeach credibility.  Although no case directly holds that a defendant who takes the stand may have her credibility impeached by reputation evidence, a review of case law clearly indicates that such impeachment is permissible.

In *Commonwealth v. Scoleri*, 432 Pa. 571, 248 A.2d 295 (1968), *vacated, Scoleri v. Pennsylvania*, 408 U.S. 934, 92 S.Ct. 2852, 33 L.Ed.2d 747 (1972), our Supreme Court stated, "Where a defendant in a criminal case takes the witness stand in his own defense he occupies the same status as any other witness and his credibility is in issue."  432 Pa. at 579, 248 A.2d at 299; *see also* Leonard Packel & Anne Bowen Poulin, *Pennsylvania Evidence* § 608.1 (1987); 81 Am.Jur.2d *Witnesses* § 967 (1992).  The reason is that "[i]f a defendant offers himself as a person worthy of belief, the jury has a right to know what kind of man he is—to aid in assessing his credibility." *Commonwealth v. Butler*, 405 Pa. 36, 47, 173 A.2d 468, 474 (1961), *cert. denied*, 368 U.S. 945, 82 S.Ct. 384, 7 L.Ed.2d 341 (1961).

During her testimony, Appellant recited her own version of the events surrounding her husband's death.  When confronted with the testimony of other witnesses, she stated that the other witnesses' recollection of the facts were incorrect.  It is clear that by testifying to a different version of the events surrounding the death, and by claiming that the other witnesses' testimony was incorrect, Appellant placed her credibility at issue.

Even though she claims that a defendant does not put her credibility at issue by testifying at trial, Appellant nevertheless concedes that *crimen falsi* convictions are admissible to impeach the credibility of a defendant who takes the stand in her own defense. However, she argues, without supporting authority, that the law is "equally clear" that evidence of a defendant's reputation for truthfulness may not be introduced unless specifically placed in issue. Thus, inherent in her argument is that evidence of *crimen falsi* crimes is different from reputation evidence. However, Appellant fails to differentiate the two methods.

Contrary to Appellant's position, it has long been the law of this Commonwealth that a witness's credibility may be attacked by showing her bad reputation for truth and veracity. *Commonwealth v. Fowler*, 434 Pa.Super. 148, 150, 642 A.2d 517, 518 (1994), *allocatur denied*, 539 Pa. 688, 653 A.2d 1227 (1994) (*citing Commonwealth v. Payne*, 205 Pa. 101, 104, 54 A. 489, 491 (1903)). In *Butler*, the court stated, "[a defendant's] previous record is admissible for [impeaching credibility] just the same as testimony of prior reputation for veracity is evidence for the jury's consideration." 405 Pa. at 47, 173 A.2d at 474. *See also Fowler*, 434 Pa.Super. 148, 642 A.2d 517 (1994) (recognizing that a defendant's good reputation for truth and veracity may be introduced when he was "impeached by evidence of bad reputation for truth and veracity."); Packel & Poulin, *supra*, § 608.1.

Based on our review of the relevant case law, we can discern no distinguishing factor that would allow the use of *crimen falsi* convictions to impeach a defendant's credibility, yet bar the use of evidence of reputation for veracity for the same purpose. Further, Appellant has provided no reason why a defendant should be treated any differently than any other witness with regard to issues of credibility; upon testifying at trial, a defendant, like any other witness, places her credibility at issue. That credibility may be impeached by prior *crimen falsi* convictions and/or by evidence of the defendant's reputation for untruthfulness. Thus, the trial court did

not abuse its discretion in allowing the Commonwealth to introduce reputation evidence of this sort.

Appellant's next allegation of error concerning the evidence of her reputation for truthfulness is that it was too remote in time to be admissible. The trial commenced on March 14, 1994. Diane Campbell testified that she knew Appellant's reputation from 1979 to the mid–1980's. Michelle Steinbacher knew Appellant's reputation from 1981 to 1985. The final reputation witness, Gloria Harbough, knew Appellant's reputation in 1989. The community from which the reputation was garnered was a hospital at which the witnesses worked, and where Appellant was employed from 1979 until 1990.

As stated above, the admission of evidence is at the trial court's discretion. It has long been held that evidence of reputation for truthfulness must relate to the time of trial.

When at the trial of a cause the character of a witness is shown in order to affect his credibility the question is whether he then told the truth. It is his character at the time he testifies that is under investigation, and this is to be established by evidence of his general reputation at that time....

*Smith v. Hine*, 179 Pa. 203, 206–07, 36 A. 222, 223 (1897); *see also Miller v. Miller*, 187 Pa. 572, 41 A. 277 (1898); *Commonwealth v. Hansell*, 185 Pa.Super. 443, 137 A.2d 816 (1958). The reason for this is that it would be unfair to judge a person, whether positively or negatively, on her remote reputation which may no longer be applicable or true.

Although recent case law does not provide specific examples of time frames by which to measure remoteness, our Supreme Court has addressed the issue in the past. *See Miller*, 187 Pa. 572, 41 A. 277 (1898) (reputation evidence related to period four years before trial too remote); *Smith*, 179 Pa. 203, 36 A. 222 (1897)(two years too remote). However, in deciding whether evidence of a defendant's prior bad acts is too remote, "no rigid rule can be formulated for determining when such evidence is no longer relevant.... The trial court's determination will not be disturbed absent an abuse of discretion."

*Commonwealth v. Ulatoski,* 472 Pa. 53, 63, 371 A.2d 186, 191–92 (1977). Even though *Ulatoski* did not address the timeliness of reputation evidence, the same principles are applicable to the immediate issue. *See Commonwealth v. White,* 271 Pa. 584, 115 A. 870 (1922) (whether reputation evidence remote in particular circumstance is at trial court's discretion).

In *White,* the court recognized that twenty year old evidence of a defendant's reputation for bad character was admissible when coupled with proof that the bad character continued at all times to the date of trial. *Id.* at 587, 115 A. at 871. Standing alone, the twenty year old reputation evidence was not admissible. *Id.* at 588, 115 A. at 871. However, accompanied by more recent bad character reputation evidence, the remote reputation evidence was proper to show that the defendant had a continuously bad reputation. *Id.*

Similarly, the admission of character evidence in the instant case evidences Appellant's continuous reputation for dishonesty. Several witnesses testified that from approximately 1979 until 1989, Appellant had a reputation for dishonesty. Thus, the Commonwealth established an on-going, continuous reputation for dishonesty, corroborated by more than one person and spanning eleven years. This is not a case in which the only reputation evidence is one witness who testified that she knew the defendant for a short time many years ago.

Based upon the trial court's discretion in this matter, there is no bright line to determine exactly when reputation evidence is too remote. In addition, remoteness is often a question of weight, not admissibility. *Ulatoski,* 472 Pa. at 62, 371 A.2d at 190–91 (*citing* 2 J. Wigmore, *Evidence* § 396 (3rd ed. 1940)). We note that in closing argument, Appellant attacked the weight of the evidence by reminding the jury of its timeliness.

Further, the gap between the most recent reputation evidence and the death of Appellant's husband was only three years. At trial, numerous statements made by Appellant at the time of the death were admitted at trial. Thus, her credibility at the time she made the statements was also in

issue. Because the reputation evidence ranged from five years before trial to only three years before the crime charged, we hold that the trial court did not abuse its discretion in determining that the reputation evidence was not too remote.

■ Appellant also takes exception to the testimony of Michelle Steinbacher that Appellant "wasn't trusted by my staff," in response to a question concerning Appellant's reputation for truthfulness. Appellant immediately objected. The trial court sustained the objection and had the answer stricken from the record. In light of the fact that the answer was brief and was stricken from the record, Appellant has not established how the testimony prejudiced her. Moreover, Appellant did not seek a curative instruction or a mistrial. *See Commonwealth v. Jones,* 501 Pa. 162, 460 A.2d 739 (1983) (issue waived for failure to request curative instruction or mistrial after objection sustained). Thus, this argument is without merit.

■ Appellant's final argument concerning the reputation evidence is addressed to the testimony of Gloria Harbough, who stated that she fired Appellant from the hospital in 1990. Appellant contends that this specific evidence of her reputation should not have been admitted. We note that Appellant raised no objection at trial to this testimony.

As the trial court correctly pointed out, Harbough testified for two purposes. One was to offer reputation evidence, and the other was to rebut Appellant's claim that she left the hospital in 1990 in order to further her education. Hence, Harbough's testimony was proper rebuttal evidence. We hold that the trial court did not abuse its discretion in admitting this evidence.

### 3. Trial Counsel's Cross-examination of Dr. Hume

■ Appellant's third point of error is that trial counsel was ineffective for not cross-examining Dr. John Hume more extensively. The Commonwealth called Dr. Hume to testify as an expert in forensic psychiatry. He testified, contrary to

Appellant's expert witness, that he did not believe the deceased was at a high risk for suicide at the time of his death. On cross-examination, Appellant's trial counsel inquired as to who had hired him to testify, the length of time period he had been involved in the case, the absence of a written report, and the fact that he was not a board certified forensic psychiatrist.

In reviewing a claim of ineffectiveness of counsel, it is Appellant's burden to show that the claim is of arguable merit, that counsel's action or inaction did not have a reasonable basis designed to effectuate her interests, and that counsel's action or inaction was prejudicial. *Paolello,* 542 Pa. at 75–77, 665 A.2d at 454. The issue here is whether counsel's cross-examination had a reasonable basis intended to effectuate her interests, and we agree with the trial court that there was such a basis for counsel's actions.

In reviewing trial counsel's performance, we will not find ineffectiveness for failure to choose the best trial tactics or strategy to effectuate Appellant's interests. Rather, the proper inquiry is whether counsel's actions or lack thereof had *some* reasonable basis. *Commonwealth v. Pierce,* 537 Pa. 514, 524, 645 A.2d 189, 195 (1994) (citation omitted). If so, counsel is deemed effective. *Id.*

Trial counsel's decision to limit his cross-examination did have some reasonable basis. Appellant presented her own expert witness, Dr. Harry A. Doyle, a certified forensic psychiatrist, who testified that in his expert opinion the deceased was at risk for suicide at the time of his death. Thus, the persuasiveness of the competing experts rested on such factors as credibility, familiarity with the case, and qualifications. During cross-examination, trial counsel elicited the fact that Dr. Hume was being paid by the Commonwealth, had only been on the case three to four weeks, did not make a written report, and was not board certified. In addition, an extended cross-examination might have allowed Dr. Hume to restate his opinion regarding the deceased's risk of suicide. Thus, trial counsel's limited cross-examination of Dr. Hume had some reasonable basis designed to effectuate Appellant's interest.

### 4. Evidence of Appellant's Prior Bad Acts

■ Appellant's fourth argument concerns evidence elicited from Bonnie Frey, who lived with the Showers during 1985 and 1986, that Appellant instructed Diane Showers, the daughter of Appellant and the deceased, to place medicine in the deceased's coffee without his knowledge. Appellant contends that this evidence is irrelevant and extremely prejudicial because the events are too remote in time, and that counsel was ineffective for failing to object to its admission.

Appellant concedes that evidence of a prior course of conduct is relevant. Her only point of contention is that the incidents were too remote in time to be admissible. In *Ulatoski*, our Supreme Court discussed the admission of evidence of prior relations between a defendant and a homicide victim:

> evidence concerning the nature of the marital relationship is admissible for the purpose of proving ill will, motive or malice. This includes, in particular, evidence that the accused physically abused his or her spouse.... [I]t is generally true that remoteness of the prior instances of hostility and strained relations affects the weight of that evidence and not its admissibility.... [N]o rigid rule can be formulated for determining when such evidence is no longer relevant.

472 Pa. at 60–61, 371 A.2d at 190–91 (citations omitted). In deciding when evidence of other crimes or bad acts is too remote, the importance of the time period is inversely proportional to the similarity of the crimes or acts. *Commonwealth v. Miller*, 541 Pa. 531, 549, 664 A.2d 1310, 1319 (1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 932, 133 L.Ed.2d 859 (1996). Remoteness is a question best left to the discretion of the trial court. *Ulatoski*, 472 Pa. at 63, 371 A.2d at 191–92 (citation omitted).

In the instant case, the prior acts and the death of the deceased occurred approximately six to seven years apart. The similarity between the acts described by Bonnie Frey and the crime charged are strikingly close. Both involved the administration of prescription drugs to the deceased in the

same manner without his knowledge. Frey testified that although Appellant explained having placed the medication in the coffee in terms of the deceased's refusal to take what had been prescribed for him, it was often done because Appellant wanted to go shopping. Having been made drowsy by the medication, the deceased could not complain about the shopping trips. Therefore there can be no contention that Appellant acted as she did for her husband's benefit. Moreover, the prior acts occurred on more than one occasion.

Based on the foregoing, any objection to the evidence of Appellant's prior acts in drugging the deceased would have been meritless, and counsel will not be deemed ineffective for failing to raise a meritless argument. *Paolello*, 542 Pa. at 75–77, 665 A.2d at 454. The evidence was relevant to show the nature of the relationship between Appellant and the deceased, and to rebut her claim that the death was a suicide. Any remoteness affected the weight of the evidence, not its admissibility.

### 5. Trooper McBride's Testimony

Appellant's fifth contention is that the trial court erred in denying a mistrial when Trooper McBride, the investigating officer, was asked about the investigation into the death of Appellant's husband. In response, he stated, "Well, in December of—now, like I say, my doubts, my concerns, my suspicions have been growing and—but there's just—I don't want to jump to a conclusion. But in December I reached the point that I felt there was a reasonable doubt that a suicide occurred." Appellant immediately objected and asked for a mistrial. The trial court denied the motion, but did give the jury a curative instruction that the use of "reasonable doubt" was irrelevant, and that the court would instruct the jury at the end of the trial on the proper use of the term.

Whether a mistrial is required is at the discretion of the trial court. *Commonwealth v. Johnson*, 542 Pa. 384, 396–98, 668 A.2d 97, 103 (1995). A mistrial is only warranted where the incident is of such a nature as to deny the defendant a fair trial. *Id.* Additionally, a jury is presumed to follow

the instructions of the trial court. *Commonwealth v. Jones,* 542 Pa. 464, 488–92, 668 A.2d 491, 503–04 (1995). A curative instruction was immediately given. Furthermore, the remark was not intentionally elicited nor exploited by the Commonwealth. We hold that the trial court did not abuse its discretion in denying a mistrial.

### 6. Limited Use Immunity for Diane Showers

■ Appellant's sixth argument revolves around the Commonwealth's grant of limited use immunity for Diane Showers in order to allow her to testify concerning certain events which occurred approximately two months before the murder. Within this issue are three arguments: 1) the grant of immunity did not comport with 42 Pa.C.S.A. § 5947; 2) the Commonwealth was erroneously allowed to treat Diane as a hostile witness; and 3) Appellant was erroneously prevented from cross-examining her on any matters beyond the scope of the limited grant of immunity.

Appellant does not have standing to allege that the grant of limited use immunity did not comply with the statutory scheme. *Commonwealth v. Schomaker,* 293 Pa.Super. 78, 87, 437 A.2d 999, 1003 n. 3 (1981) (*citing Commonwealth v. Russell,* 225 Pa.Super. 133, 136–37, 310 A.2d 296, 298 (1973), *rev'd on other grounds,* 501 Pa. 404, 461 A.2d 1220 (1983)). The section addressing requests and issuance of an immunity order reads:

> The Attorney General or a district attorney may request an immunity order from any judge of a designated court, and that judge shall issue such an order, when in the judgment of the Attorney General or district attorney:
> (1) the testimony or other information from a witness may be necessary to the public interest; and
> (2) a witness has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.

42 Pa.C.S.A. § 5947(b).

■ Appellant contends that the Commonwealth did not satisfy the requirement that the immunized testimony be

necessary to the public interest. Whether a grant of immunity was proper is an issue that concerns the rights of the person who is ordered to testify pursuant to the grant. Therefore, only that person may contest the necessity of the testimony or information to the public interest.

Appellant's next two arguments on this issue concern the interrogation of Diane Showers. The trial court allowed the Commonwealth to treat the witness as hostile, and limited Appellant's cross-examination of her to matters related to the limited use immunity.

The scope and manner of cross-examination is left to the discretion of the trial court whose decision will not be disturbed absent an abuse of that discretion. *Commonwealth v. Wilson,* 538 Pa. 485, 506, 649 A.2d 435, 445 (1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 145, 133 L.Ed.2d 91 (1995). The trial court allowed the Commonwealth to treat Diane as a hostile witness based upon her relation to Appellant, her invocation of her right not to incriminate herself, her involvement in the preparation of Appellant's defense, and her refusal to cooperate with the state police. We find no error in the court's decision. *See Commonwealth v. Settles,* 442 Pa. 159, 275 A.2d 61 (1971) (Commonwealth could cross-examine its own witness who was sister-in-law and associate of defendant).

Contrary to Appellant's claim, the trial court did not err in limiting Appellant's cross-examination of Diane to matters related to the immunity. The cross-examination was restricted to the scope of the Commonwealth's examination. Moreover, the court gave Appellant the option of calling Diane at a later point if the need arose. Finally, Appellant does not indicate what she would have explored on cross, nor how she was prejudiced by any limitation placed on her inquiries. The trial court did not abuse its discretion in its rulings concerning Diane's testimony.

### 7. Janette Andrews' Testimony

Appellant's seventh allegation of error pertains to the testimony of Janette Andrews, a friend of Diane's. The Commonwealth attempted to establish that approximately two months

before the deceased's death, Appellant called Diane late at night and asked her to find out if the deceased was at Sylvia Knecht's house. Diane testified that she, rather than Appellant, had initiated the conversation, and that she went to Sylvia Knecht's house not at Appellant's request, but to look for the deceased because he had tried to phone her earlier.

Andrews was with Diane that evening, and her testimony contradicted Diane's version of events. According to Andrews, Appellant had telephoned Diane, not the other way around. Andrews testified that Diane told her that Appellant reported seeing the deceased's car parked at Sylvia Knecht's house earlier in the day, and that Appellant wanted Diane to discover whether the car was still there. Andrews also testified that Diane called her two weeks prior to trial and commented that their versions of what had transpired were inconsistent.

Appellant contends that Andrews' testimony was erroneously admitted because the Commonwealth was allowed to impeach its own witness, Diane, by eliciting a different version of the events to which Diane testified. Appellant also alleges that Andrews' testimony contained inadmissible hearsay. Furthermore, Appellant contends that it was impermissible for Andrews to testify that Diane called her two weeks before trial to tell her that their versions of the event were different, because the testimony went beyond both the scope of the Diane's limited immunity and the Commonwealth's offer of proof for Andrews.

Again, our standard of review on matters involving the admission of evidence is whether the trial court abused its discretion. The court held that the Commonwealth did not intend to impeach Diane, and only called Andrews after Diane had testified to a different version of the events of the evening in question. The court also held that Andrews' testimony concerning Diane's telephone call two weeks before the trial was not hearsay because it was used for purposes of impeachment, nor did it exceed the scope of Diane's limited immunity or the offer of proof because the conversation pertained to events about which Diane had already testified.

■ We first note that the Commonwealth did not impeach Diane by eliciting from Andrews a different version of the events of the night in question. Our Supreme Court has explicitly held, "[I]t is well settled a party may contradict his own witness by independent evidence showing facts to be different from those testified to by such witness[.] ... Such rule does not violate the general rule that one may not impeach his own witness because to contradict is not to impeach." *Commonwealth v. Myrick*, 468 Pa. 155, 164, 360 A.2d 598, 602 (1976) (citations omitted).

■ Appellant's contention that Andrews' testimony contained inadmissible hearsay also fails. Although Andrews did repeat what Diane told her, the trial court correctly noted that the out-of-court statement was not used for the truth of the matter, but to impeach Diane. It is well-settled that a witness may be impeached by a prior statement as long as the statement is inconsistent with her trial testimony. *Commonwealth v. Brown*, 538 Pa. 410, 427, 648 A.2d 1177, 1185 (1994). It is clear in the instant case that what Diane said to Andrews on the night in question was inconsistent with her trial testimony.

■ Appellant claims that the Commonwealth could not impeach its own witness because it was not surprised by her testimony. It is within the trial court's discretion to permit a party to impeach its own witness with prior inconsistent statements. *Commonwealth v. Grimes*, 436 Pa.Super. 535, 545, 648 A.2d 538, 540 (1994). The element of surprise is not an absolute requirement, "Pennsylvania courts have frequently permitted parties to contradict or impeach witnesses called by them without a strict requirement of surprise when the interests of truth and justice seem to require it." *Commonwealth v. Brady*, 510 Pa. 123, 135, 507 A.2d 66, 72 (1986) (*quoting Commonwealth v. Gee*, 467 Pa. 123, 137, 354 A.2d 875, 881 (1976)).

In response to Appellant's contention that the Commonwealth sought to call Diane as a hostile witness based on foreknowledge of the evidence she would give, we note, as

stated above, that she was treated as a hostile witness for reasons other than the substance of her proposed testimony. Moreover, the trial court expressly found that the Commonwealth did not know what Diane would say on the stand. Additionally, Diane's testimony was detrimental to the Commonwealth's case as it directly contradicted events related by Andrews. We hold that based upon the interests of "truth and justice," the trial court did not abuse its discretion in allowing the Commonwealth to impeach Diane with Andrews' testimony.

Further, Andrews' testimony that Diane called her two weeks before the trial was not improperly admitted. The trial court allowed this evidence on the ground that it impeached Diane, and that it was not outside the scope of Diane's limited immunity because the conversation concerned events about which Diane had already testified.

Even if the testimony concerning the telephone call was inadmissible, Appellant has not shown how it prejudiced her. Andrews did not testify that Diane told her to change her story or to lie. Rather, she merely testified that during their conversation, Diane said that Appellant did not know about the trip to Sylvia Knecht's house on the evening in question, and that their recollections of that night were different. Given the fact that Andrews had already contradicted Diane's version of events, this evidence was merely cumulative of other, properly admitted evidence. Therefore, we hold that even if the trial court abused its discretion in allowing Andrews' testimony to be admitted into evidence, Appellant has not shown sufficient prejudice requiring a new trial.

## 8. The Commonwealth's Cross-examination of Dr. Doyle

Finally, Appellant argues that the trial court erred in allowing the Commonwealth to cross-exam Dr. Doyle, the defense's forensic psychiatrist, about a report that Appellant was having an affair during the mid–1970's. She contends that the evidence was inadmissible hearsay, highly prejudicial, and too remote in time. Appellant alleges that a cautionary instruction should have been given.

As previously stated, the scope and limits of cross-examination are at the trial court's discretion. Moreover, the trial court told Appellant that she could request a cautionary instruction. No request was ever made. Finally, the Commonwealth properly explored Dr. Boyle's basis for his expert opinion. Dr. Boyle relied upon events which occurred as early as 1972. In addition, there were numerous references to Appellant's extramarital affairs already in evidence. Thus, the hearsay claim is unsupported and meritless, and the trial court did not abuse its discretion in allowing the Commonwealth to cross-examine Dr. Boyle concerning Appellant's alleged affair.

Affirmed.

McEWEN, President Judge, dissents.