**COMMONWEALTH of Pennsylvania,**
**Appellee,**

v.

**Judy Ann SHOWERS, Appellant.**

Superior Court of Pennsylvania.

Submitted Feb. 5, 2001.

Filed Aug. 20, 2001.

Reargument Denied Oct. 25, 2001.

---

Caroline Roberto, Pittsburgh, for appellant.

John P. Muncer, Assistant District Attorney, Sunbury, for Com., appellee.

Before: CAVANAUGH, LALLY-GREEN and TAMILIA, JJ.

CAVANAUGH, J.

¶ 1 This appeal is from the denial of a first request for post-conviction relief from a life sentence for first degree murder. The central issue for determination is whether appellant showed by a preponderance of the evidence that counsel on direct appeal did not have a rational, strategic, or tactical basis for not pursuing the five issues now presented. We conclude that appellant has not borne her burden of proof, and therefore, we affirm the denial of post-conviction relief.

¶ 2 This court affirmed the judgment of sentence upon direct appeal in a published opinion on June 20, 1996. *Com. v. Showers*, 452 Pa.Super. 135, 681 A.2d 746 (1996). Appellant was represented by new counsel on that appeal, William C. Costopoulos, Esquire, who raised a total of eight issues of trial error and of the effectiveness of the representation of trial counsel, Michael Rudinski, Esquire. A petition for allowance of appeal was denied by the Pennsylvania Supreme Court on November 27, 1996. 546 Pa. 665, 685 A.2d 544 (1996). The United States Supreme Court denied a petition for a writ of certiorari on May 12, 1997. 520 U.S. 1213, 117 S.Ct. 1698, 137 L.Ed.2d 824 (1997). On May 11, 1998, current counsel, Caroline M. Roberto, Esquire, filed a petition on behalf of appellant pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541–9546. The allegations upon which relief was sought pertained to alleged ineffective representation both by trial counsel, Mr. Rudinski, and by appellate counsel, Mr. Costopoulos.

¶ 3 After the conduct of two evidentiary hearings and submission of briefs by the parties, the PCRA court denied relief in an order and opinion dated April 16, 1999. In an order and opinion filed January 7, 2000, the lower court again denied the PCRA motion. A notice of appeal from this order was filed on January 28, 2000. By order contained in a memorandum opinion dated June 12, 2001, this panel of the court remanded the case to the lower court for expansion of the record for an explanation of the entry of the two substantially identical orders. On remand, the lower court determined that the first order and opinion had not been served upon either defense counsel or upon the Commonwealth, and, therefore, vacated the order of April 16, 1999, by order dated June 27, 2001. Since the lower court retained inherent authority to correct court errors that would produce unfair results, *Jackson v. Hendrick*, 560 Pa. 468, 746 A.2d 574, 576–577 (2000), this appeal is now properly before us.

¶ 4 The salient facts underlying the conviction were recited in our opinion at 452 Pa.Super. 135, 681 A.2d 746, 749. A jury convicted appellant of first degree murder of her husband. The cause of death was a lethal dose of liquid morphine. The defense was that Mr. Showers had committed suicide and was not the victim of foul play perpetrated by his wife. Among the Commonwealth's evidence was appellant's admission that she had forged a suicide note, and evidence that she knew of a current extramarital affair between her husband and a mutual friend, that she was alone with her husband in their home at the time he died, and that she benefitted financially upon his death.

■ ¶ 5 The instant collateral appeal raises five challenges to the effectiveness of trial counsel and a challenge to the effectiveness of direct appeal counsel for not raising any of the five identified issues on direct appeal. (Appellant had a right to effective assistance of counsel on that direct appeal. *Com. v. Balodis*, 560 Pa. 567, 747 A.2d 341 (2000)). The statement of the two broad issues in appellant's brief is as follows:

I. Whether trial counsel provided ineffective assistance of counsel under the state and federal constitutions where he failed to:

A. investigate and pursue a forensic, medical-scientific defense and call an available forensic pathologist to establish that the prosecution's theory of homicide was impossible in light of forensic analysis of its own immutable physical evidence, which also proved the manner of death was suicide;

B. object to the Coroner's improper expert opinion that the manner of death was homicide, based upon his detailed recap of the police investigation and ongoing thought processes of investigator's;

C. object to the prosecution's pathologist's improper so-called "clinical history" of the case, another "recap" of the investigation;

D. object to yet another "recap" of the investigation by the final witness, a state trooper, whose recap and explanation of his thought processes was essentially a preview of closing argument, but, largely, not evidence; and

E. to move to suppress illegally obtained bank records and tax returns.

II. Whether new appellate counsel provided ineffective assistance of counsel under the state and federal constitutions where he failed to raise any of the foregoing instances of trial counsel's constitutionally inadequate representation, which appellate counsel correctly believed to be of arguable merit.

■ ¶ 6 To be eligible for relief under the PCRA, a petitioner must plead and prove by a preponderance of the evidence that an issue has not been previously litigated or waived, and that any failure to litigate an issue prior to or during trial, during unitary review, or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel. 42 Pa.C.S.A. § 9543(a)(3), (4). Where there is an allegation of violation of the state and/or federal constitutions or an allegation of ineffective assistance of counsel, a petitioner must plead and prove by a preponderance of the evidence that, in the circumstances of the particular case, the error so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. 42 Pa.C.S.A. § 9543(a)(2)(i), (ii). Where a petitioner has demonstrated that counsel's ineffectiveness has created a reasonable probability that the outcome of the proceedings would have been different, then no reliable adjudication of guilt or innocence could have taken place. *Com. v.*

*Kimball,* 555 Pa. 299, 724 A.2d 326, 333 (1999). Counsel is presumed to be effective and petitioner has the burden of proving otherwise. *Com. v. Holloway,* 559 Pa. 258, 739 A.2d 1039, 1044 (1999). Counsel cannot be considered ineffective for failing to raise a claim that is without merit. *Id.*

¶ 7 Unless appellant proves by a preponderance of the evidence that Mr. Costopoulos was ineffective for not raising the five issues identified in this appeal, she is entitled to no relief. Specifically, under 42 Pa.C.S.A. § 9543(a)(4), it is appellant's burden to show that the decision of Mr. Costopoulos to raise only eight issues for review on direct appeal could not have been the result of any rational, strategic or tactical decision by him.

¶ 8 Where counsel is faulted for forgoing some of the issues which the client wished to raise, the relief available is an evaluation of the claims prior counsel has forgone for a determination of ineffectiveness. *Com. v. Albrecht,* 554 Pa. 31, 720 A.2d 693, 701 (1998). Relief will be granted only if the petitioner shows 1) that counsel's conduct, by action or omission, was of questionable legal soundness; 2) that the conduct complained of had no reasonable basis designed to effectuate the client's interest; and 3) that counsel's conduct had an adverse effect on the outcome of the proceedings. *Id.* (quoting *Com. v. Clark,* 551 Pa. 258, 710 A.2d 31, 35 (1998)).

¶ 9 There is no requirement under the U.S. Constitution for appellate counsel to raise and to argue all colorable, nonfrivolous issues which a criminal defendant may seek to have reviewed on appeal. *Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). In delivering the opinion of the Court, Chief Justice Burger stated the following:

Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues. Justice Jackson, after observing appellate advocates for many years stated:

"One of the first tests of a discriminating advocate is to select the question, or questions, that he will present orally. Legal contentions, like the currency, depreciate through over-issue. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at lack of confidence in any one.... [E]xperience on the bench convinces me that multiplying assignments of error will dilute and weaken a good case and will not save a bad one." Jackson, Advocacy Before the United States Supreme Court, 25 Temple LQ 115, 119 (1951).

Justice Jackson's observation echoes the advice of countless advocates before him and since. An authoritative work on appellate practice observes:

"Most cases present only one, two, or three significant questions.... Usually, .... if you cannot win on a few major points, the others are not likely to help, and to attempt to deal with a great many in the limited number of pages allowed for briefs will mean that none may receive adequate attention. The effect of adding weak arguments will be to dilute the force of the stronger ones." R. Stern, Appellate Practice in the United States 266 (1981).

There can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising

issues for review. . . . A brief that raises every colorable issue runs the risk of burying good arguments—those that, in the words of the great advocate John W. Davis, "go for the jugular," Davis, The Argument of an Appeal, 26 ABAJ 895, 897 (1940)—in a verbal mound made up of strong and weak contentions.

*Id.*, at 751–753, 103 S.Ct. 3308 (footnote omitted).

■■■ ¶ 10 The Pennsylvania Supreme Court has addressed the issue of appellate counsel's duty of representation and has concluded similarly that state law does not require appellate counsel to raise all potentially appealable issues. *See Com. v. Yocham*, 473 Pa. 445, 375 A.2d 325 (1977) (counsel on direct appeal is not obligated to present every issue raised at trial and the decision not to pursue a preserved claim is weighed in light of the traditional ineffective assistance of counsel standard); *Com. v. Laboy*, 460 Pa. 466, 333 A.2d 868, 870 (1975) ("If, in view of the reasonable alternatives, the appellate advocate had any rational basis for restricting the appeal to the one or two issues chosen, then he has performed as an effective counsel and it matters not that he rejected other issues whether gathered from his own research or advanced by the client."); *cf. Com. v. Townsell*, 474 Pa. 563, 379 A.2d 98, 101 (1977) (*Substantial matter* of arguable merit is not to be abandoned on the ground that it might de-emphasize another issue. At least, appellate counsel should brief each *significant arguable* issue. Complete disregard of an *important issue* cannot be ignored as a matter of strategy. (emphasis supplied)).

¶ 11 The principle of effective marshalling of issues raised on appeal has been endorsed by this court, frequently with a reference to the following pithy observations of Judge Ruggiero Aldisert:

With a decade and a half of federal appellate court experience behind me, I can say that even when we reverse a trial court it is rare that a brief successfully demonstrates that the trial court committed more than one or two reversible errors. . . . [W]hen I read an appellant's brief that contains ten or twelve points, a presumption arises that there is no merit to any of them. I do not say that this is an irrebuttable presumption, but it is a presumption nevertheless that reduces the effectiveness of appellate advocacy. Appellate advocacy is measured by effectiveness, not loquaciousness. Aldisert, The Appellate Bar: Professional Competence and Professional Responsibility—A View from the Jaundiced Eye of One Appellate Judge, 11 Cap. U.L.Rev. 445, 458 (1982).

*Estate of Lakatosh*, 441 Pa.Super. 133, 656 A.2d 1378, 1380 n. 1 (quoting *United States v. Hart*, 693 F.2d 286, 287 n. 1 (3d Cir.1982)).

*Com. v. Hunter*, 768 A.2d 1136, 1139 (Pa.Super.2001).

■■■ ¶ 12 Effective assistance of counsel on appeal is *informed by the exercise of the expertise with which counsel is presumably imbued*. It is the obligation of appellate counsel to present issues which, in counsel's professional judgment, "go for the jugular" and do not get lost in a mound of other colorable, nonfrivolous issues which are of lesser merit. *See Jones v. Barnes, supra; Com. v. Laboy, supra.* Any evaluation of the effectiveness of appellate counsel must strike a balance between the duty to exercise professional judgment to limit the number of issues presented and the duty not to fail to litigate a substantial matter of arguable merit that presents a reasonable probability that a different outcome would have occurred had it been raised by prior counsel. It is

the circumstances of the particular case which must guide a court in determining whether the truth-determining process was so undermined by the alleged ineffectiveness that no reliable adjudication of guilt or innocence could have taken place. 42 Pa.C.S.A. § 9543(a)(2)(ii).

■ ¶ 13 We view the following as significant circumstances of this particular case, relevant to the effectiveness of counsel on direct appeal:

1. Appellant's defense was focussed upon her contention that her husband committed suicide. The nature of the defense limited the number of facts in contention, although the areas of dispute were of obvious importance. For example, appellant did not dispute that her husband took the drug Serax, an anti-anxiety medication, on the evening before his death; she did not dispute that the cause of death was the oral ingestion of Roxanol, liquid morphine; she did not dispute that she was the author of the purported suicide note found under her husband's body by his brother. The thrust of the defense was to bring facts before the jury that would cause it to conclude that Mr. Showers was the cause of his own demise.

2. Our review of both the trial record and the proceedings on direct appeal demonstrates that counsel at each level possessed the qualifications necessary to perform the task at hand. Both Mr. Rudinski and Mr. Costopoulos were experienced criminal defense attorneys at the time they were privately retained by appellant.

3. Mr. Costopoulos raised eight primary issues on direct appeal. Several issues contained sub-issues within them. He sought, and received, permission from this court to submit a brief with a two-page statement of questions involved, in exception to Pa.R.A.P. 2116(a) which mandates a one-page statement. The brief was 53 pages in length, in contravention of Pa.R.A.P. 2135(1) which sets a 50-page limit.

¶ 14 To impart the level of advocacy which Mr. Costopoulos brought to bear on behalf of appellant, we quote verbatim the eight issues presented in the brief:

A. Whether the evidence is insufficient, as a matter of law, to sustain the verdict because the Commonwealth failed to prove beyond a reasonable doubt that Delbert Showers was murdered by the appellant as opposed to having had committed suicide or, alternatively, whether the verdict was against the weight of the evidence which demonstrated that the victim had a long history of chronic depression, had been hospitalized and under medical treatment for it, had told several persons he intended to commit suicide shortly before his demise, was a high risk for suicide according to a forensic psychiatrist and had committed suicide?

B. Whether the trial court erred in permitting the Commonwealth to call several negative character reputation witnesses to testify that the appellant had a reputation for not being honest when she did not place the honesty of her character into evidence; the testimony was based on knowledge of appellant's reputation that was 10 to 15 years old and thus remote, irrelevant and prejudicial; and one witness improperly and prejudicially testified that she was fired from her nursing job and was not trusted by the hospital staff, which testimony was beyond the scope of character evidence?

C. Whether trial counsel was ineffective for failing to conduct any meaningful cross-examination of Dr. John Hume, the Commonwealth's psychiatrist, who opined that Delbert Showers was not a suicide risk, which testimony directly

contradicted the defense theory that Mr. Showers committed suicide and the defense forensic psychiatrist's opinion that he definitely was a high suicide risk?

D. Whether the trial court erred when it allowed the Commonwealth to introduce evidence that Diane Showers, the daughter of appellant and her husband, had given medication to Delbert Showers several years before his death, which testimony was irrelevant, remote and highly prejudicial to the defense?

E. Whether the trial court erred in refusing to grant a mistrial after the affiant testified that he felt that there was a reasonable doubt that the death of Delbert Showers was a suicide, which was an improper opinion, invaded the province of the jury and had the effect of rendering the personal belief that appellant was guilty?

F. Whether the trial court erred when it permitted the Commonwealth to grant use immunity to Diane Showers for a limited purpose when the grant was given solely in order to impeach her testimony by that of a later Commonwealth witness, to cross examine Diane Showers as a hostile witness, limiting defense counsel's cross examination to matters that were granted in the use immunity, and failing to compel the Commonwealth to give use immunity for all testimony from Diane Showers or preclude her from testifying because she invoked her right against self-incrimination?

G. Whether the trial court erred in allowing Janette Andrews to testify when she was called for the exclusive reason of impeaching Diane Showers and her testimony, which was hearsay, went beyond the scope of the offer of proof and the grant of immunity, thereby prejudicing the appellant?

H. Whether the trial court erred in permitting the prosecutor to cross examine the defense forensic psychiatrist as to a report that Delbert Showers had caught the appellant having an affair with one Mr. Styers in 1975/1976, which line of questioning was irrelevant, remote and highly prejudicial to the appellant?

Brief for Appellant, No. 1378 PHL 1995, at 3–4.

¶ 15 At the evidentiary hearing held on September 24, 1998, on the PCRA petition, appellant's new counsel, Ms. Roberto, presented the testimony of Mr. Costopoulos. He testified that he had considered each of the five issues now presented on appeal as instances of ineffectiveness of trial counsel. He gave the following reason for not including them as appellate issues:

> In reviewing the record for the purpose of determining what issues our office would take on direct appeal to the Superior Court, we determined that the issues we did raise, which were eight in number, in our opinion, were the issues with the most merit. It was for that reason we raised those issues and only those issues. It was not because we felt that the issue you have now raised was without merit. We raised the issues we did because we thought those issues had the most merit, and we decided not to shotgun the Appellate Court with 15 issues and went with eight.

N.T., 9/24/98, at 5.

¶ 16 Upon cross-examination the following exchange occurred:

Q. Are any of the issues that are now raised, that we're here about today, are any of those issues new issues to you?

A. No.

Q. Is it fair then to say that you actually had considered all of these issues that are raised now, you had considered these when you were representing the defendant?

A. Yes.

Q. But your testimony is that you chose not to raise these other issues; correct?

A. We chose not to raise these other issues; that is correct.

Q. Would it be fair to characterize that as part of a tactical decision not to raise these issues?

A. There was a reason why we didn't; and if that is tactical, then you could call it tactical.

Q. And the reason you have already stated here today; haven't you?

A. The reason is we went with the ones we thought, at that time, had the most merit. And having practiced before the Appellate Courts, it has been my experience and my belief that you don't—you take to the Appellate Courts a limited number of issues that have the most merit rather than every possible issue that has some merit.

Id., at 10–11.

¶ 17 Based upon Mr. Costopoulos' articulation of reasons for not raising certain issues, in the context of the circumstances of this case, we conclude that appellant has not borne her burden of proof under the PCRA to show that his course of action did not have a "rational, strategic, or tactical" basis.[1] None of the allegations of error raises an issue of significant arguable merit. Therefore, we find that appellate counsel could properly choose not to pursue them through the exercise of valid tactical strategy.[2]

■ ¶ 18 The first allegation of ineffectiveness is failure to present the testimony of an expert forensic witness for the defense to testify that Roxanol has an extremely bitter taste that cannot be masked and was not, in fact, masked in its administration to Mr. Showers. The inference sought to be drawn from such testimony would be that it would not be possible to cause him to involuntarily take the lethal dose of Roxanol.

¶ 19 At the PCRA hearing appellant presented the testimony of expert witness Cyril H. Wecht, M.D. Dr. Wecht testified to his opinion, held to a reasonable degree of medical certainty, that Mr. Showers took the Roxanol on a voluntary basis, i.e., that he chose to drink it, rather than the drug having been in some surreptitious or forcible fashion introduced into his G.I. system. The bases for this opinion were the lack of any substance other than morphine in the victim's stomach for masking the bitterness of the drug, and the lack of evidence of trauma on the victim's body which would suggest the use of force. Dr. Wecht testified that the amount of Serax in the victim's bloodstream was at a therapeutic level and it would not have rendered him incapacitated or even drowsy. Dr. Wecht testified that he would have been willing to testify to these opinions at appellant's trial in 1994.

¶ 20 During the course of closing argument for the defense at trial, Mr. Rudinski addressed the jury as follows as to the Commonwealth's evidence regarding the ingestion of the Roxanol:

> The Commonwealth also called in a forensic pathologist. He was a very important witness in this case, Dr. Isidore Mihalakis. He came up from Allentown

---

1. 42 Pa.C.S.A. § 9543(a)(4).

2. If, as in many PCRA cases, counsel had not sought to demonstrate that prior counsel's ineffectiveness for failure to litigate could not have been for a rational, strategic, or tactical reason, our analysis would be complete, for the burden under § 9543(a)(4) rests with the petitioner. However, since, here, counsel has challenged Mr. Costopoulos' reasons we are constrained to consider the contentions.

for them. He did the autopsy. He was extremely important. He testified that he looked for needle marks to see of there was an injection site. He found none.

But the most important thing he testified about was not brought up when he testified on direct examination, but on cross-examination. I asked him, "What's this stuff about aspirations in the throat? Why did you dissect that throat?" "To see if there was signs of aspirations." He told you that's—"if you get a liquid in here it's like bringing it back up or if there's a problem there." They dissected the whole neck. They wanted to see if there was aspirations. They went to the lungs. They wanted to see if there was aspirations.

Do you know why? It's real reasonable. Somehow the Commonwealth thinks that Judy Showers took this liquid and got it down—and you saw the cups he showed you how much liquid it would be—and she poured that down this 250 pound man's throat somehow. Ask yourself. "If that's the key, how did that happen? How do you do that?"

Well, their theory is, "Well, gee, he had Serax there, too." So, "gee, he was out of his mind and drank this." Ladies and gentlemen, the testimony was so clear from their toxicologist and the other person we have—you know, we have experts everywhere. But the toxicologist says it was a therapeutic amount. That's the amount you're supposed to take.

"It would be like a valium," he testified. He didn't say, "Well, you take one of these and you're gone. You just fall down and don't know what you're doing. You wouldn't know your surroundings." He said, "You would be aware of your surroundings. But if you were already tired, you may go to sleep."

So he's aware of his surroundings if he takes the Serax. If he's aware, how do we get this Roxanol in? Remember the testimony? Extremely bitter tasting. Helen Wolfe says, "I couldn't take it. I only took one dose with orange juice. I couldn't stand it." Never took it again.

But the doctor did his independent study. Put a little finger on it. "Well, that could be hidden." If he wanted to do a study for you, ladies and gentlemen, and he wanted to come in here and show you it could be hidden, what he should have done is mix it with something and said, "Gee, I mixed it with something, tasted it, and I couldn't taste nothing." He should have mixed an amount like this in a glass and said, "Now let me taste." He didn't do that.

He's here for the Commonwealth. Ladies and gentlemen, there is no way to explain how he got it in there or how she could have given him Roxanol without him knowing it. The taste is there. It's horrible.

The Serax—are you going to tell me for a minute that she hid this Serax from him and snuck it in there so he couldn't see it? Look at that glass. That's what [is] left. Look at it. Gee, he wouldn't have noticed that, would he?

Or did Delbert [Mr. Showers] take it like he always took it, opening the capsules and putting them in. And did he take this to relax a little bit to get enough nerve to kill himself?

You'll say he took so much Serax he fell asleep and took the Roxanol. That's what the aspirations are for to make sure he didn't bring it back up. There is no signs of it. She couldn't have given it to him when he was asleep. It tastes so horrible she couldn't give it to him when he was awake. How did she do it? They have their burden.

They're telling you she did it. There is no way in the world to reconcile that point. No way, And that's the point they have to prove to you.

N.T., 3/14/94, at 2002–2005.

¶ 21 Defense counsel argued that based upon the Commonwealth's own evidence it failed to prove the manner in which appellant administered the Roxanol to the victim. Mr. Rudinski referred to the testimony offered by the prosecution and the failure to explain in a convincing fashion the mechanism by which it was possible for Mr. Showers to take the morphine involuntarily.

■ ¶ 22 The argument before this court is that it was ineffective for Mr. Costopoulos to fail to raise the issue of Mr. Rudinski's not presenting a defense expert to address what the Commonwealth forensic witness failed to explain. However, we find that, on the basis of Mr. Rudinski's argument to the jury, this issue is not a substantial matter of arguable merit. Trial counsel need not introduce expert testimony on his client's behalf if he is able effectively to cross-examine prosecution witnesses and elicit helpful testimony. *Com. v. Copenhefer,* 553 Pa. 285, 719 A.2d 242, 253 (1998); *Com. v. Williams,* 537 Pa. 1, 640 A.2d 1251, 1265 (1994). Nor is counsel ineffective for failing to call a medical, forensic, or scientific expert to critically evaluate expert testimony which was presented by the prosecution. *Copenhefer, supra* at 253–254, n. 12 (citing *Com. v. Smith,* 544 Pa. 219, 675 A.2d 1221, 1230 (1996)).

¶ 23 It was reasonable for Mr. Rudinski to rely upon his cross-examination of the Commonwealth expert in his demonstration of the weakness of the prosecution theory regarding the manner of administration of the lethal drug. Appellant's argument that Mr. Rudinski did an ineffectual job of cross-examination of the Commonwealth's experts is belied by our review of the record. We find the cross-examination was within the bounds of trial advocacy to be expected of an experienced criminal defense attorney. Since trial counsel did not render ineffective assistance for failing to present an expert, it was reasonable for Mr. Costopoulos not to raise the defense failure to call its own expert. He made a tactical decision to omit this issue in light of the other issues he considered of greater merit that he did raise and argue on direct appeal.

■ ¶ 24 We also find that appellant has not demonstrated that there is a reasonable probability that the outcome of the trial would have been different had Dr. Wecht or another forensic witness been presented by the defense. As noted, the gaps in the testimony of the Commonwealth's forensic witness were competently exploited by defense counsel in closing argument. We see no reason to conclude that the jury would have reached a different verdict were it presented with an expert witness whose testimony would have provided the same basis for defense counsel to argue as did the expert of the Commonwealth. There was no factual dispute concerning the bitter taste of the Roxanol, nor was there a dispute that the contents of the victim's stomach did not include a sweet substance, such as fruit juice, that would mask the taste of the Roxanol. We will not find inevitably ineffective a defense that failed to refute with its own expert that which, arguably, had not been established by a Commonwealth expert witness. *See id.* We find that appellate counsel did not render ineffective assistance for failing to raise the issue of trial counsel's failure to present the testimony of a forensic expert witness.

¶ 25 The next three allegations of ineffectiveness all challenge the failure to object to testimony that "recapped" the Commonwealth's case. The focus of our inquiry is again whether direct appeal counsel was ineffective for not raising these issues. Appellant argues that trial counsel should have objected to the coroner's testimony that the manner of death was homicide, to the use of a clinical history by the physician who performed the autopsy, and to the entire testimony of the chief investigating officer regarding his growing suspicions that the victim had been murdered. In her statement of questions involved appellant characterizes the challenged testimony of each of the three witnesses as a "recap" of the Commonwealth case. However, counsel is not ineffective for failing to pursue cumulative evidence. *Com. v. Mason,* 559 Pa. 500, 741 A.2d 708, 717 (1999). Similarly, failure to object to cumulative evidence is not ineffective where there is sufficient evidence in the record for conviction and there is no basis upon which to conclude that the outcome of the trial would have been different had counsel objected to the testimony. The testimony at issue does not compel a finding that appellant has borne her burden of showing that no reliable adjudication of guilt or innocence could have taken place absent an objection to it.

¶ 26 The final issue raised is the failure to pursue on direct appeal an unpreserved challenge to the validity of the search warrants which resulted in seizure of tax and bank records. The records were used by the Commonwealth to establish a financial motive for appellant to kill her husband. Mr. Costopoulos testified that he did not pursue this issue on direct appeal because he believed that the court

would find that there was probable cause for the issuance of the search warrants and that the court would apply the doctrine of inevitable discovery to justify the legality of the seizure of the bank and tax records. Appellant argues that the Commonwealth used the search warrants as a general investigative tool and that they are defective because only the phrase "suspicious death" rather than identification of a crime appears in them. Appellant relies upon *Com. v. Bagley,* 408 Pa.Super. 188, 596 A.2d 811 (1991) for the proposition that where an affidavit of probable cause does not specify a crime it is invalid.[3] This reading of *Bagley* ignores the emphasis placed by this court upon the importance of the Commonwealth's reciting its having information which contradicted the accused's version of events. *Id.,* at 821. Here, the information possessed by the Commonwealth regarding the multiple contradictions and discrepancies in the appellant's statements are an adequate basis to establish probable cause for issuance of the warrants. Appellant has not demonstrated that trial counsel was ineffective in not pursuing this issue and has not demonstrated that appellate counsel did not have a tactical reason for not raising this issue since it is not a substantial matter of arguable merit.

¶ 27 Having found that appellant has not demonstrated that counsel on direct appeal failed to render effective assistance of counsel, we find no error in the lower court's denial of relief pursuant to the PCRA.

¶ 28 Order affirmed.

¶ 29 Judge Tamilia files a Dissenting Opinion.

TAMILIA, J., dissenting:

---

**3.** This language is derived from the *Bagley* opinion as to search warrant # 12504. However, the *Bagley* majority reversed in part the

trial court's order of suppression pursuant to three other warrants.

¶ 1 The defining issue in this matter is whether the victim, who according to the Commonwealth's theory unknowingly ingested a toxic substance, Roxanol (liquid morphine), would have or could have done so without any evidence that the drug's acute bitterness was masked so as to conceal its presence.

¶ 2 Despite the substantial circumstantial evidence in support of the homicide theory, the crucial issue remains the state of mind of the victim. Unless the victim knew the nature of the substance and was determined to take his own life, would he or could he have ingested the admittedly bitter, unmasked toxic substance without being aware an attempt was being made to poison him? The critical nature of this issue sets up a clear credibility determination for the jury as to whether the deceased knowingly ingested a bitter toxic substance, consistent with the defense's theory of suicide, or whether in some fashion, consistent with the Commonwealth's homicide theory, the substance was surreptitiously given to the victim by appellant.

¶ 3 The Commonwealth argued appellant either (1) forcibly introduced the fatal dose of Roxanol into the victim's mouth; or (2) disguised the lethal substance so that the unwitting victim ingested the substance voluntarily. In support of the latter theory, the prosecution presented expert testimony by forensic pathologist, Dr. Isidore Mihalakis, who opined the bitter taste of Roxanol could be masked by strong coffee, orange juice or liquor. To contradict this expert testimony, defense counsel relied solely on his cross-examination of Dr. Mihalakis, and the lay testimony of Helen Wolfe, a cancer patient and friend of the decedent for whom Roxanol had been prescribed. Given the substantial circumstantial evidence offered by the prosecution, I believe rebuttal testimony by an independent, credible expert witness was necessary to present to the jury the sharp, crucial contrast between voluntary and involuntary ingestion of a bitter toxic substance, the single most critical element of this case, as well as evidence or lack thereof relating to refluxation. Trial counsel's failure to locate and develop an expert rebuttal witness constituted ineffectiveness, causing appellant irreparable prejudice. *See Commonwealth v. Copenhefer,* 553 Pa. 285, 719 A.2d 242 (1998), *cert. denied,* 528 U.S. 830, 120 S.Ct. 86, 145 L.Ed.2d 73 (1999) (holding to sustain an ineffectiveness claim, a defendant must prove by a preponderance of the evidence (1) the underlying claim is of arguable merit; (2) counsel had no reasonable basis for his action or inaction; and (3) counsel's action or inaction caused his client prejudice).

¶ 4 The testimony which could have been presented in that regard, as illustrated at the PCRA hearing by Dr. Cyril Wecht, a nationally recognized pathologist, indicates there was and is such expert rebuttal testimony available. It is the Commonwealth's position, however, that counsel's failure to produce such a witness at the time of trial has resulted in waiver. I disagree.

¶ 5 The waiver rule to which the Commonwealth refers applies to factual and substantive witnesses such as those at the scene of the crime, alibi witnesses or character witnesses, all of whom would be within the personal knowledge of appellant. Counsel cannot be found ineffective for failing to call witnesses of whose existence defendant failed to inform him. *See Commonwealth v. McSloy,* 751 A.2d 666 (Pa.Super.2000), *appeal denied,* 564 Pa. 728, 766 A.2d 1246, 2000 Pa. LEXIS 2352 (2000) (holding to find ineffectiveness for failure to call a witness, the defendant must demonstrate (1) the existence and availability of the witness; (2) counsel's

knowledge of the witness; (3) the witness's willingness to testify; and (4) how defendant was prejudiced by the absence of that testimony). In this situation, however, while appellant may not have been personally aware of experts such as Dr. Wecht, it was trial counsel's duty, in his role as a zealous advocate, to produce an expert rebuttal witness to counter the expert testimony of the Commonwealth's witness. Trial counsel's failure to secure such expert testimony denied appellant the opportunity to have an independent expert whose unbiased, knowledgeable testimony undoubtedly would have been far more convincing to the jury than that of a lay witness friend. Such inaction by counsel caused appellant irreparable harm, exemplifies ineffectiveness and cannot be excused.

¶ 6 The trial attorneys for appellant were highly experienced, with numerous jury trials to their credit. Such highly seasoned and well regarded criminal trial lawyers unquestionably should have and could have secured a reputable pathologist or toxicologist to rebut the testimony of the prosecution's expert. In fact, at the PCRA hearing, two experts testified with regard to the need for expert rebuttal testimony, necessary to counter the damning testimony of Dr. Mihalakis. Dr. Wecht opined there was no evidence of forced administration of the Roxanol, and the decedent voluntarily ingested the fatal dose of morphine. He also testified Roxanol was an extremely bitter liquid, could not have been administered surreptitiously without a huge amount of disguising substance, and the autopsy revealed no evidence of a diluting or masking agent. Dr. Wecht testified that had he been called as an expert witness, such would have been his testimony.

¶ 7 Dr. Harry Doyle, a defense witness at trial, also testified at the PCRA hearing and swore he advised trial counsel to secure an expert to address the virtual impossibility of disguising Roxanol's bitter taste. Dr. Doyle testified he had provided trial counsel with the names of three possible experts qualified to address the undeniably bitter taste of Roxanol, and it was his understanding counsel was going to call an expert on that subject.

¶ 8 This particular ineffectiveness claim turns on trial counsel's failure to actively enlist the aid of an expert to rebut the testimony of the Commonwealth's expert, and the record is devoid of any serious attempt by trial counsel to locate an expert witness in time for trial. The somewhat lurid and sensational nature of this case required the best scientific, medical and psychological presentation of evidence of state of mind and intent. Defense counsel's failure to zealously defend his client mandates reversal.

¶ 9 I would grant a new trial.